## UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| MISSOURI PET BREEDERS ASSOCIATION *et al.* | ) | |
| | ) | Case No.: 14-cv-6930 |
| Plaintiffs, | ) | |
| v. | ) | |
| | ) | |
| COUNTY OF COOK through the Cook | ) | |
| County Board of Commissioners; *et al* | ) | |
| | ) | |
| Defendants | ) | |

## PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION FOR A TEMPORARY RESTRAINING ORDER AND A PRELIMINARY INJUNCTION

## INTRODUCTION

Cook County passed the Companion Animal and Consumer Protection Ordinance ("Ordinance," Exhibit A) that bans Cook County Pet Shops from purchasing animals from almost all breeders and becomes effective on October 1, 2014. The Ordinance bans the Pet Shops[1] from selling puppies, kittens, and rabbits purchased from even loving, responsible breeders, who are devoted to raising animals the responsible and ethical way. Without question, this Ordinance will put the Pet Shops—which have collectively been in business more than 50 years—out of business and cause financial ruin to them and their owners.

Just a few months ago, a District Court entered a preliminary injunction when the City of Phoenix enacted a similar ordinance. *Puppies 'N Love v. City of Phoenix,* CV-14-00073-PHX-DGC, 2014 WL 1329296 (D. Ariz. Apr. 2, 2014) (Exhibit B) and before then against El Paso, Texas for its puppy ordinance. *Six Kingdoms Enterprises, LLC v. City of El Paso, Tex.,* EP-10-CV-485-KC, 2011 WL 65864 (W.D. Tex. Jan. 10, 2011) (Exhibit C). The District Courts found

---

[1] "Pet Shops" refers to the pet store plaintiffs Starfish Ventures, Inc. ("Petland of Hoffman Estates"), Happiness Is Pets Of Arlington Heights, Inc. ("Happiness"), and J & J Management, Inc. ("Petland of Chicago Ridge").

serious questions were raised as to the constitutionality of the proposed ordinances. Cook County's Ordinance is also unconstitutional for several reasons:

**Commerce Clause**:   The Ordinance was structured to impact interstate commerce.  As its sponsor explained "[t]he only thing that we can do to impact breeders from out of state is to try to affect regulations that would keep people from selling dogs from breeders from out of state here."   In fact, 98% of America's USDA-licensed breeders are located outside of Illinois and almost all are now prohibited from selling to the Pet Shops. The Ordinance intentionally cuts off the interstate animal importation pipeline by prohibiting purchases from those breeders the USDA has licensed to transport animals. From a practical perspective, this means out of state breeders must now have a physical presence in Cook County to compete. It also means that hundreds of Illinois-based unlicensed and unregulated breeders will benefit to the detriment of out of state breeders and the Pet Shops.

**Equal Protection:** The Ordinance allows even unlicensed breeders to sell the very same animals that the Pet Shops are prohibited from selling, only allows breeders with certain federal licenses to sell, and exempts not-for-profits who sell the very same animals.

**Preemption:** Cook County did not have the authority to pass the Ordinance. The purchase and sales of animals is highly regulated on federal and state levels.

**Impairment Of Contracts:**  Happiness has contracts with breeders obligating them to purchase all puppies bred by certain animals. The Ordinance, however, prohibits Happiness from buying from those very breeders. Furthermore, because the Ordinance will put the Pet Shops out of business, they will default on long-term leases and franchise agreements.

The Ordinance is unnecessary and detrimental to animal welfare.  As recognized by the Chicago Veterinary Medical Association, ordinances such as these will have a negative effect. It

will result in the proliferation of unlicensed and irresponsible animal sales and have virtually no impact on shelter overcrowding as only 3% of dogs at shelters are from pet shops.

<u>FACTS</u>

**I.    The Pet Shops:**    The Pet Shops are small family operated businesses devoted to the sale of responsibly and ethically raised pure and specialty breed animals. Combined, they have been in business for over half a century. In all of this time, the Pet Shops have never received a violation associated with the sale of dogs, cats, or rabbits despite regularly being inspected by the Illinois Department of Agriculture. (Exhibit F, Affidavit of Dan Star ("Star Affidavit"), ¶¶ 3-4; Exhibit H, Affidavit of Jim Maciejewski ("Maciejewski Affidavit"), ¶¶ 3-4; Exhibit I, Affidavit of Ronald Berning ("Ronald Berning Affidavit"), ¶¶ 3-5).

Happiness purchases its puppies from Indiana-based Amish breeders who maintain necessary licensing to operate both at the state and federal level. The puppies are provided direct access to outdoor runs where the puppies can socialize and play. Happiness sells no animals other than puppies.  (Exhibit I, Ronald Berning Affidavit, ¶ 6-8). The Petland stores purchase their dogs through breeders located primarily in Iowa and Missouri. The Petland entities receive the assistance of their franchisor, Petland, Inc., and are dedicated to sourcing and raising healthy animals and working with responsible breeders who have any required state and federal licensing. (Exhibit F, Star Affidavit, ¶ 6-7; Exhibit H, Maciejewski Affidavit, ¶ 6-7).

By the time that a customer purchases a puppy from the Pet Shops, they have typically been checked by multiple veterinarians, including by local ones who come into each Pet Shop weekly to examine the animals. Consumers are provided with health warranties. The Pet Shops sell dogs that are up to date on vaccinations, de-wormings, and are microchipped, and provide

extensive information disclosing the source of the animals purchased. (Exhibit F, Star Affidavit, ¶ 10; Exhibit H, Maciejewski Affidavit, ¶ 10; Exhibit I, Ronald Berning Affidavit, ¶ 9).

II.     **The Association:**     Plaintiff Missouri Pet Breeders Association ("MPBA") is the nation's oldest and largest professional pet organization. It exists, in part, to advocate for the interests of its members. MPBA is located in Missouri and its members will be affected and injured if the Ordinance is upheld because they will be deprived of the right to continue the sale of puppies, rabbits, and kittens to pet shops in Cook County, Illinois. Breeding is a major industry in Missouri; there are not breeders located there than any other state. (Exhibit J, Affidavit of Hank Grosenbacher ("Grosenbacher Affidavit"), ¶ 3-6).

III.    **The Ordinance.**

A.      **Background**: The Board of Commissions deviated significantly from established procedures (referral to the Legislation and Intergovernmental Relations Committee) to pass the Ordinance within 6 days of when it was first considered. Commissioner Schneider explained, "I have never seen an issue before this Board where [we handled an ordinance this way].... I am a little puzzled by how we proceeded today."[2]  Nor had there apparently been any review by the County's lawyers before passing the Ordinance.[3]   The Commissions practice here was so unusual, that the month after the Ordinance passed, Cook County passed another Ordinance (14-3170) *requiring* that amendments be referred to Committee before being passed.

The Pet Shops wanted to avoid litigation and have worked diligently to protect their rights. After the Ordinance was abruptly passed, they had meetings throughout the summer wherein they proposed alternative legislation. The American Veterinary Medical Association ("AVMA") proposed an alternative amendment that no one appears to be wiling to consider,

---

[2] http://legacy.cookcountygov.com/secretary/Granicus%20Page.html.  Board of Commissioner 04/09/2014 video at 2:16:28.
[3] See http://legacy.cookcountygov.com/secretary/Granicus%20Page.html at 2:14:30.

leaving the Pet Shops with no choice but this lawsuit to save their small businesses and the jobs of those they employ. (Exhibit F, Star Affidavit, ¶ 30; Exhibit I, Ronald Berning Affidavit, ¶ 29).

**B.    Ordinance Overview:**    The Ordinance requires a "pet shop operator" to only sell dogs, cats, or rabbits obtained from certain governmental entities, a humane society or rescue organizations or breeders. Subsection (a)(3) limits breeders in a manner that effectively serves as a per-se breeder ban (for the reasons discussed below) because the breeder must have a USDA Class "A" license with five (5) or fewer female breedable dogs.

**C.    The Ordinance's Impact On Interstate Commerce.** The Ordinance's sponsor (Commissioner Fritchy) explained that the Ordinance was aimed at stopping breeders "from out of state" from doing business "here" in Cook County.  "The only thing that we can do to impact breeders from out of state is to try to affect regulations that would keep people from selling dogs from breeders from out of state here."[4]  As explained below, the Ordinance achieves this goal.

**1.    Almost All Breeders Are Located Outside of Illinois.**  More than 98% of USDA licensed breeders in the United States are located outside of Illinois. (Exhibit G, Affidavit of Jonathan Berning ("Jonathan Berning Affidavit"), ¶ 8-10; Exhibit I, Ronald Berning Affidavit, ¶ 29). While there are only 25 USDA licensed breeders in Illinois, there are 634 in Missouri and 220 in Iowa. (Exhibit I, Ronald Berning Affidavit, ¶ 29). Happiness and Petland Chicago Ridge obtains 100% of their puppies from out of state breeders and Petland of Hoffman Estates obtains 98.71% of its animals from out of state. Indeed, most Pet Shops in the state of Illinois obtain a substantial portion of their puppies from other states because there is a very limited supply of breeder-provided animals in Illinois. (Exhibit F, Star Affidavit, ¶ 7; Exhibit G, Jonathan Berning Affidavit, ¶ 8; Exhibit H, Maciejewski Affidavit, ¶ 7; Exhibit I, Ronald Berning Affidavit, ¶ 29).

---

[4] http://legacy.cookcountygov.com/secretary/Granicus%20Page.html at 0:49:58 (April 9, 2014 Meeting)

## 2. Local Breeders (And Others) Can Continue To Sell Directly In Cook County.

The Ordinance bans Cook County Pet Shops from selling animals but it allows the very same animals to be sold by the breeders themselves. Even unlicensed irresponsible breeders can sell directly in Cook County. There are hundreds and hundreds of unlicensed breeders located in Illinois. The Ordinance imposes no restrictions on them and in fact expressly affirms that it allows consumers to obtain animals directly from breeders. (Exhibit G, Jonathan Berning Affidavit, ¶ 16, Exhibit I, Ronald Berning Affidavit, ¶ 30).

The nature of animal sales is such that being physically present is critical for sales to occur. You cannot order a puppy, kitten, or a rabbit through the mail. As such, consumers will often want to see an animal before making a purchasing decision. Cook County consumers are not likely to travel into another state, like Missouri, to purchase an animal if they can purchase directly from a breeder located in Illinois. From a practical standpoint, if these breeders want to continue to sell directly into Cook County, they will have to have a physical presence in Cook County (and become licensed) so that their animals can be seen. This is prohibitively expensive as it can cost hundreds of thousands of dollars to set up in Illinois as a breeder. (Exhibit F, Star Affidavit, ¶ 21; Exhibit H, Maciejewski Affidavit, ¶ 21; Ronald Berning Affidavit, ¶ 20; Exhibit J, Grosenbacher Affidavit, ¶ 6). This is especially because the Ordinance now prohibits these breeders from utilizing dealers to sell their animals in Cook County. In fact, in December 2013, the USDA underscored the importance of "face to face" contact in the sale of an animal in redefining its own definition of a pet store in its effort to address animal Internet sales:

> The buyer, seller, and the pet available for sale must all be physically present at the time of purchase or before taking custody of the animal in order to meet the definition of a "face-to-face" transaction and remain exempt from licensing. Photos, webcam images, Skype sessions or other electronic means of communication are not a substitute for the buyer or their designee personally observing the animal.[5]

---

[5] http://www .aphis.usda.gov/publications/animal_welfare/2013/faq_retail_pets_final_rule.pdf.

**3.** **The Ordinance Cuts Off The Interstate Animal Supply Pipeline.** The Ordinance prohibits Pet Shops from purchasing animals from dealers/breeders with a USDA Class "B" license, *i.e.,* the transport providers for animals. Dealers who purchase animals and resell them (typically purchasing them from neighboring states and transporting them into Illinois) are required to have a USDA Class "B" license. They are a pipeline that allows small pet stores in Illinois to keep inventories of animals available for repurchase.[6] Dealers serve as a critical source for pet stores to obtain their animals from other states. They provide expensive animal transport vehicles equipped with proper ventilation system and storage, drivers must be properly trained in animal care, and they must meet the other significant regulatory requirements. As such, the Ordinance's elimination of Class B license holders as an available source of animals has effectively shut off Cook County from obtaining animals in interstate commerce especially since virtually all breeders in neighboring states are unqualified to serve as animal sources as explained below. (Exhibit H, Maciejewski Affidavit, ¶ 8; Exhibit F, Star Affidavit, ¶ 8).

**4.** **The Ordinance Is Essentially A De Facto Ban Against Out Of State Breeders.** The Ordinance serves as a de facto ban prohibiting breeders from selling to Cook County Pet Shops because while it allows for the purchase of animals from a breeder with a USDA Class "A" license and 5 or fewer females, this is almost an impossible standard to meet. The USDA does not require any license if a breeder has 4 or fewer animals. 9 CFR § 2.1(a)(3)(iii). The Ordinance bans the sale of puppies from a breeder who has 6 (six) or more breedable female animals. *The only breeder who would qualify to sell would be one that had a USDA license and exactly 5 female animals, no more and no less.* (Exhibit F, Star Affidavit, ¶ 33).

---

[6] *See e.g.,* Subpart B, 9 CFR § 2.25 (requiring that each "carrier and intermediate handler" be licensed). For an overview of the licensing and registration under the Animal Welfare Act, see http://www.aphis.usda.gov/animal_welfare/downloads/aw/awlicreg.pdf.

The Ordinance bans 96% of the USDA breeding facilities in states surrounding Illinois from sourcing to the Pet Shops. All 25 of Wisconsin's breeders are eliminated, all but 3 of Indiana's 119 breeders are eliminated, all but 4 of Iowa's 220 breeders are eliminated, and all but 29 of Missouri's 634 breeders are eliminated. (Exhibit G, Jonathan Berning Affidavit, ¶ 10).

While the Ordinance effectively cuts off non-Illinois based breeders, it will allow Illinois' hundreds of *unlicensed* breeders (those with 4 or fewer breedable females) to continue to sell its dogs in Cook County (so long as they are not sold to pet shop) and it will also allow Illinois licensed breeders to sell directly to Cook County consumers (but not through Pet Shops) since they are physically located in Illinois (as explained above face to face contact in an animal sale is crucial) and already licensed under all applicable state and federal standards. Illinois will only have 3 USDA licensed breeders that meet the 5 or fewer female standard that can sell to the Pet Shops. Any breeder with 5 or fewer breedable females cannot be relied upon for a steady source of animals since a female is only capable of producing a limited number of offspring per year, which varies depending on the breed. (Exhibit G, Jonathan Berning Affidavit, ¶ 10-11).

From a practical standpoint, these in-state breeders will serve to be the exclusive Illinois source for breeder-provided dogs. The Pet Shops would only have a sporadic and limited supply of animals that would not come close to meeting the local demands. For example, Petland Hoffman Estates alone sells approximately 700 puppies per year. In the past two years, it has used almost 400 breeders. In other words, even if 100% of America's available breeders under the Ordinance sold their dogs into Cook County, it would not come close to meeting even one of the Pet Shop's needs. (Exhibit F, Star Affidavit, ¶ 36; Exhibit I, Ronald Berning Affidavit, ¶ 33).

**5.    The Ordinance will force the Pet Shops out of business.** As the Pet Shops' business is focused on the sale of pure and specialty breed puppies, animal control centers,

humane societies, and rescue organizations cannot provide it with an economically-viable source for sustaining their business. The Pet Shops will be required to close down, employees will have to be laid off, contracts will be violated, and consumers will have less reliable and responsible source from which to purchase healthy animals from. (Exhibit F, Star Affidavit, ¶ 26; Exhibit H, Maciejewski Affidavit, ¶ 26; Exhibit I, Ronald Berning Affidavit, ¶ 24).

Customers go to the Pet Shops because they want a specialty breed of dog where the origins of the dog and breeds are known. By way of comparison, the average selling price of a dog at a Pet Store is approximately $1,200 while the average price at a shelter is around $150. (Exhibit I, Ronald Berning Affidavit, ¶ 13).

Effective last year, Illinois passed the so-called "Puppy Lemon Law" that places upon Pet Shops—but exempts not for profit organizations like shelters—an obligation to provide warranties for the puppies that are sold. 225 ILCS 605/3.15(f) provides for remedies to consumers if their dog or cat has medical problems. Pet Shop consumers are entitled to warranties, exchanges, and reimbursement of veterinarian bills, and attorneys fees. From a practical standpoint, the Puppy Lemon Law means that the expenses associated with a dog or a cat with a heart murmur, bad knees, or other hereditary conditions are all the responsibility of the consumer if purchased from a shelter. However, the financial burden would fall on the pet store if sold privately. (Exhibit F, Star Affidavit, ¶ 16-17; Exhibit H, Maciejewski Affidavit, ¶ 16-17).

One of the reasons that the Pet Shops invest in purchasing from responsible breeders is to avoid incurring liability under a warranty. By purchasing from known and reliable breeders, Pet Shops will minimize responsibility for future problems. This is a risk that a pet store cannot help control if an animal is obtained from a random source such as a shelter.

Finally Pet shops that have attempted to sell shelter animals have not been successful. For

example, Petland in Wheaton, Illinois attempted to switch is business model and failed utterly. (Exhibit E) Petland of Hoffman Estates attempted to reach out to the not-for profit community and almost no one was willing to even work with it. (Exhibit F, Star Affidavit, ¶ 38)

> **6.    Contractual Impairment:**

**(a)    Consumer Warranties.**    The Pet Shops have entered into thousands of warranty/contracts that they cannot honor under the Ordinance. For example, Happiness provides a two-year warranty to consumers if a puppy has certain congenital defects providing consumers with options including "a replacement puppy of equal value." The statutory warranty provides consumers with a right to a new animal "of comparable value chose by the customer." 225 ILCS 605/3.15(g). Animals from shelters are not of equal monetary value as the pure bred animals that have been purchased and which have their breeders identified. The Pet Shops would not be able to source animals that comply with their own warranties or Illinois law's mandated warranty. (Exhibit I, Ronald Berning Affidavit, ¶ 13, 22).

**(b)    Breeder Agreements:** Happiness has entered into exclusive contracts with breeders obligating it to purchase *all* of the puppies produced from approximately 300 dogs. This approximately $300,000 investment has placed dogs with twelve responsible breeders—all of whom are disqualified under the Ordinance. Happiness has entered into an oral agreement with these breeders that prohibit the breeders from selling the puppies from these dogs to anyone but Happiness. It also obligates Happiness to purchase 100% the puppies that are produced from these dogs. If Happiness cannot purchase dogs from these breeders, it will be violating its obligation to do so. (Exhibit I, Ronald Berning, Affidavit, ¶ 26).

**(c)    Leases and Franchise Agreements.** The Pet Shops all have long term lease agreements. Likewise, the Petland entities will default under their 20 year franchise agreements

and become liable for damages by shutting down. (Exhibit F, Star Affidavit, ¶ 27-28; Exhibit H, Maciejewski Affidavit, ¶ 27-28; Exhibit I, Ronald Berning Affidavit, ¶ 25).

### III.    The Pet Shops Are Not Responsible For Shelter Overcrowding.

Pet shop animals constitute a tiny fraction of animal sales and shelter placements. Even the anti-pet shop group American Society for the Prevention of Cruelty to Animals estimates that only between 2% and 10% of dogs sold are purchased at pet shops. Scientific literature suggests that only 3.9% of shelter dogs and 4.7% of shelter cats originate from pet shops sales.[7] Dogs sold at pet stores have microchips placed underneath the skin between the shoulder blades. As a result, when animals end up at shelters, their source is tracked suggesting that approximately 3% of the dogs that end up in shelters are from pet shops. (Exhibit F, Star Affidavit, ¶ 37)

Animals sold from the Pet Shops receive multiple levels of protection to ensure that they are humanely raised, transported, maintained at the pet store, and healthy. First, they are purchased from properly licensed and regulated breeders and not from "mills." (Exhibit F, Star Affidavit, ¶ 5; Exhibit H, Maciejewski Affidavit, ¶ 5; Exhibit I, Ronald Berning Affidavit, ¶ 6). They are imported into Illinois in accordance with regulations. Their care at the pet store is in turn governed by Illinois statute and regulation, particularly the Illinois Animal Welfare Act. As explained above, after they are sold, the owners receive a guarantee of health.

A common reason that an animal is given back to a shelter is due to the cost of medical problems (which warranties minimize). When a consumer makes a purchase from a pet shop, they are making a large financial commitment. As such it is not surprising that the scientific studies have concluded that "[d]ogs were at increased risk of relinquishment if they were

---

[7] http://www.examiner.com/article/u-s-pet-ownership-statistics-shelter-pets-need. See also, Exhibit F at p. 185, *Characteristics of Shelter Relinquished Animals and their Owners Compared with Animals and Their Owners in the U.S. Pet Owning Households,* Journal of Applied Animal Welfare Science. (2000) at Table 2.

obtained at no cost or if their purchase cost was less than $100."  (Exhibit K at p. 188).

While the Ordinance is apparently designed to stop "animal mills," it is clear that the Ordinance has the opposite effect. Faced with a similar ordinance in Chicago, the Chicago Veterinary Medical Association warned that "[t]he elimination of consumer choice through banning puppy and kitten sales in reputable pet stores can result in consumers and pets suffering from a lack of regulation when seeking alternative, unregulated sources outside City of Chicago." (Exhibit E)[8] Therefore, instead of eliminating these substandard facilities, the Ordinance actually favors their expansion, by eliminating the source of commercially bred puppies in the City that are regulated on multiple levels. These risks are substantial as the Chicago Veterinary Medical Association has opined:

- Such ordinances selectively apply to animal sources and continue to allow "backyard breeders";
- By banning the sales of purebred pets in the pet shops, the public will be denied consumer protection in IL Public Act 098-0509;
- A pet sold in a pet store has the greatest chance of receiving the highest quality veterinary care should it become ill within the first year of life as a result of IL Public Act 098-0509; and
- The elimination of consumer choice through banning puppy and kitten sales in reputable pet stores can result in consumers and pets suffering from a lack of regulation when seeking alternative, unregulated sources.

## ARGUMENT

I. **Standard For Restraining Order and Preliminary Injunction.** To obtain preliminary injunctive relief, a party must demonstrate: "(1) its case has some likelihood of success on the merits; (2) that no adequate remedy at law exists; and (3) it will suffer irreparable harm if the injunction is not granted." *Ty, Inc. v. Jones Grp., Inc.*, 237 F.3d 891, 895-96 (7th Cir. 2001). A "likelihood of success" exists if the party seeking injunctive relief shows that it has a

---

[8] Upon information and belief, the Chicago Ordinance, which is not effective until next year, has not been challenged.  There are very few pet stores in Chicago.  They are very small and likely cannot afford to challenge it.

"better than negligible" chance of succeeding on the merits. *Meridian Mut. Ins. Co. v. Meridian Ins. Grp., Inc.,* 128 F.3d 1111, 1114 (7th Cir. 1997) (reversing denial of preliminary injunction). The court then "weighs all of these factors, sitting as it would a chancellor in equity [and applies] the sliding scale approach; the more likely the plaintiff will succeed on the merits, the less the balance of irreparable harms need favor the plaintiff's position." The Court may rely on affidavits, allegations in verified complaints, and even hearsay or other inadmissible evidence. *See Flynt Distrib. Co., Inc. v. Harvey*, 734 F.2d 1389, 1394 (9th Cir. 1984).

Plaintiffs at this stage need only raise serious questions about the Ordinance's enforceability to preserve the status quo. *See, Puppies 'N Love,* CV-14-00073-PHX-DGC, 2014 WL 1329296, at *4 ("Plaintiffs need not show that they are likely to succeed on the merits. Instead, they can show that their complaint presents 'serious questions going to the merits.'"); *Republic of the Philippines v. Marcos*, 862 F.2d 1355, 1362 (9th Cir. 1988) ("Serious questions are 'substantial, difficult and doubtful, as to make them a fair ground for litigation and thus for more deliberative investigation.'").

**II.   Irreparable Harm Exists.** Irreparable harm exists because Plaintiffs' businesses will be destroyed, sales lost, and a threat of regulatory enforcement exists. Courts have "pointed to the availability of injunctive relief where there was a threat of imminent . . . civil enforcement nature against parties who were affected by an unconstitutional act." *Am. Trucking Associations, Inc. v. City of Los Angeles*, 559 F.3d 1046, 1057 (9th Cir. 2009); *Puppies 'N Love,* CV-14-00073-PHX-DGC, 2014 WL 1329296, at *3 (irreparable harm exists because pet shop could not "compete on a for-profit basis with subsidized shelters and humane societies that provide the same dogs for free or for a minimal price" and that they would go out of business and lay off their employees); *Six Kingdoms Enterprises,* EP-10-CV-485-KC, 2011 WL 65864, at * 9 ("the

ordinance is certain to drive Plaintiff entirely from business, which constitutes an irreparable injury.").[9]

There is not just a threat, but a certainty of immediate, irreparable harm if this Court does not restrain enforcement of the Ordinance as to Plaintiffs. As of October 1, 2014, Cook County will assert that it is illegal for the Pet Shops to sell animals purchased from 98% of America's breeders, even though they are entirely reputable and not so-called "puppy mills." The Ordinance bans substantially all their inventory and the Pet Shops simply have no other means of supply for the product on which their business depends. Unable to operate, the Pet Shops would be forced to lay off many employees. Moreover, here the asserted constitutional ills are joined with actual economic harms of shutting down the Pet Shops and the loss of intangible consumer goodwill from being unable to operate the business during litigation of the case.

**III.    The Balance of Equities Tips Sharply in Plaintiffs' Favor.** The balance of harms favors the Plaintiffs because the Pet Shops have operated without any legal violation for more than a half century and they have offered evidence that they act in compliance with all federal and state laws. *See, Puppies 'N Love,* CV-14-00073-PHX-DGC, 2014 WL 1329296, at *4 ("balance of hardships tips sharply in Plaintiffs' favor" in part because the pet store did not purchase its dogs from puppy mills); *Six Kingdoms Enterprises,* EP-10-CV-485-KC, 2011 WL 65864, at *10 ("The balance of equities in this case is clear. On Plaintiff's side, a restraining order will allow it to continue in business, pending further proceedings in this case, whereas no relief will lead to irreparable injury").

---

[9] *See also*, *Illinois Sporting Goods Ass'n v. Cnty. of Cook*, 845 F. Supp. 582, 585 (N.D. Ill. 1994) (where gun stores may lose profits and go out of business pending consideration of the constitutionality of an ordinance, irreparable harm exists); *Center, Inc. v. Canyon Television & Appliance Rental, Inc.*, 944 F.2d 597, 603 (9th Cir. 1991); *Doctor John's, Inc. v. City of Sioux City, Iowa*, 305 F. Supp. 2d 1022, 1039 (N.D. Iowa 2004).

Here, there is no irreparable prejudice to Cook County if it cannot enforce an unconstitutional ordinance. Cook County will lose no benefits or funds that would otherwise be collected; in fact it will lose the tax dollars as the Pet Shops go out of business. There also is no prejudice here because these Pet Shops are not purchasing their animals from so-called "mills," but rather from licensed breeders. *See Sak v. City of Aurelia, Iowa*, 832 F. Supp. 2d 1026 (N.D. Iowa 2011) (preliminary injunction granted where city passed an ordinance that outlawed ownership of pit bulls that impacted owner and dog with no history of aggression).

**IV. Plaintiff Have Raised Serious Questions Regarding Whether The Ordinance Violates the Commerce Clause.** *Puppies 'N Love* found that "Plaintiffs' Commerce Clause argument, although vigorously disputed, presents an issue worthy of factual development and the Court's careful consideration." *Puppies 'N Love,* CV-14-00073-PHX-GDC, 2014 WL 1329296, at *4. *Six Kingdoms Enterprises* found that "the ordinance plainly has a discriminatory impact upon out-of-state interests." *Id.* at *8. It explained that "like the milk law at issue in [*Dean Milk Co. v. Madison,* 340 U.S. 349 (1951)] this regulation . . . in practical effect excludes from distribution in [El Paso] wholesome [puppies] produced elsewhere." *Id.* at *8.

"The Commerce Clause 'has long been recognized as a self-executing limitation on the power of the States to enact laws imposing substantial burdens on such commerce.'" *Dennis v. Higgins*, 498 U.S. 439, 447 (1991); *see* U.S. Const. art. 1, § 8, cl. 3. The first step in the analysis is to determine "whether a challenged law discriminates against interstate commerce." *Dep't of Revenue of Ky. v. Davis*, 553 U.S. 328, 338 (2008). If there is discrimination, either intentionally or functionally, the law is dead on arrival: "A discriminatory law is 'virtually *per se* invalid,' and will survive only if it 'advances a legitimate local purpose that cannot be adequately served by reasonable nondiscriminatory alternatives.'" *Dep't of Revenue of Ky.*, 553 U.S. at 338. If the law

15

is not discriminatory, then the issue is whether "the burden imposed on [interstate] commerce is clearly excessive in relation to the putative local benefits." *Dep't of Revenue of Ky.*, 553 U.S. at 338. This Ordinance fails both tests.

    **A.    The Ordinance Is *Per Se* Invalid.** The Ordinance discriminates on its face. A "pound" located outside Illinois is a prohibited source of animals while one located inside of Illinois is a permitted source. The Ordinance defines "Pound" as any facility licensed by the Illinois Department of Agriculture and approved by the Administration . . . and used as a shelter for seized, stray, homeless, abandoned or unwanted animals." To be "licensed by the Illinois Department of Agriculture," it is necessary to operate *inside* the state of Illinois. *See,* 225 ILCS 605/3 (requiring a license to operate "in this State").[10]

    As the Ordinance discriminates against interstate commerce on its face, it is per se invalid. *Dep't of Revenue of Ky.*, 553 U.S. at 338 (2008). As such, this Ordinance is "under rigorous scrutiny" and Cook County must demonstrate "that it has no other means to advance a legitimate local interest." *C & A Carbone*, *Inc. v. Town of Clarkstown, N.Y.*, 511 U.S. 383, 392 (1994); *see also Fulton*, 516 U.S. at 345 ("strictest scrutiny").

    Cook County can meet neither of these heavy burdens. Assuming the purpose is seeking to eliminate puppy mills, this is not a "local" purpose that could justify discrimination in favor of the locality. The Ordinance itself characterizes these mills as a national and not local problem and "[n]o State may attempt to isolate itself from a problem common to the several States by

---

[10] See also, *Avery v. State Farm Mut. Auto. Ins. Co.,* 216 Ill. 2d 100, 185 (2005) (statutes do not have extraterritorial effect "unless an intent to do so is clearly expressed"). Furthermore, the Animal Control Act defines "pound" interchangeably with "animal control facility" and utilizes the same definition as the Ordinance: "'Pound' or 'animal control facility' may be used interchangeably and mean any facility approved by the Administrator for the purpose of enforcing this Act and used as a shelter for seized, stray, homeless, abandoned, or unwanted dogs or other animals." 510 ILCS 5/2.18. In fact, there is not even a place on the state license application to put a state of address since it is assumed all such facilities are in Illinois. http://www.agr.state.il.us/Forms/AnimalHW/AW-1.pdf.

raising barriers to the free flow of interstate trade." *Chem. Waste Mgmt., Inc. v. Hunt*, 504 U.S. 334, 339 (1992). More importantly, the County has not even tried "reasonable nondiscriminatory alternatives." A ready alternative would be to do what every government does: regulate. It would be feasible, for example, for a pet shop to be required to sell puppies purchased only from licensed or hobby breeders, or breeders with no direct violations, among other options. *Hunt v. Washington State Apple Adver. Comm'n*, 432 U.S. 333, 354 (1977); *Jones v. Gale*, 470 F.3d 1261, 1270 (8th Cir. 2006). Responsible store owners like these Pet Shops would have no problem complying with reasonable alternatives that do not force them out of businesses.

>    **B.**    **The Ordinance Unconstitutionally Interferes With Interstate Commerce.**

The Ordinance also violates the Commerce Clause because it deprives out-of-state breeders like MPBA's members from having access to the Cook County marketplace and interferes with the ability of the Pet Shops from having access to out of state animals. The Supreme Court has routinely struck down even facially neutral laws that have the effect of altering the market such that "[o]ut-of-state [producers] are deprived of access to local demand for their services" and thereby "hoard a local resource—be it meat, shrimp, or milk [or, here, purebred puppies]—for the benefit of local businesses that treat it." *C & A Carbone, Inc. v. Town of Clarkstown, N.Y.*, 511 U.S. 383, 391-92 (1994). Advantaging of local market participants at the expense of out-of-staters is classic unconstitutional conduct. *See City of Phila. v. New Jersey*, 437 U.S. 617 (1978); *Fort Gratiot Sanitary Landfill, Inc. v. Mich. Dept. of Natural Res.*, 504 U.S. 353 (1992).

A locality may not "burden[] the flow of interstate commerce by restricting access of out-of-state suppliers to local markets." *La. Dairy Stabilization Bd. v. Diary Fresh Corp.*, 631 F.2d 67, 69 (5th Cir. 1980). Indeed, local governments cannot take any action to "advanc[e] their own commercial interests by curtailing the movement of articles of commerce, either into or out of

the state." *Fort Gratiot Sanitary Landfill, Inc.*, 504 U.S. at 359. A ban, coupled with a "physical presence" in the state exception, is "just an indirect way of subjecting out-of-state [businesses], but not local ones, to the [discriminatory] system" and is constitutionally invalid for restricting out-of-state access to local market demand. *Granholm v. Heald*, 544 U.S. 460, 474-75 (2005); *C & A Carbone, Inc.,* 511 U.S. at 391 (1994) (The ordinance is no less discriminatory because in-state or in-town processors are also covered by the prohibition); *Kendall-Jackson Winery, Ltd. v. Branson*, 82 F. Supp. 2d 844 (N.D. Ill. 2000).

As such, facially-neutral restrictions that have the effect of burdening out of state suppliers have routinely been held unconstitutional. *Pike v. Bruce Church, Inc.*, 397 U.S. 137, (1970) held that forcing a grower of cantaloupes to open a facility in another state at a substantial cost constituted an unlawful burden upon interstate commerce. In *Family Winemakers of California v. Jenkins,* 592 F.3d 1 (1st Cir. 2010) a Massachusetts ordinance that allowed "small" wineries (those producing less than 30,000 gallons of wine) to distribute wine in the state in multiple ways but restricted large wineries to either select direct sales or wholesalers was unconstitutional. Although facially neutral, by distinguishing between the large and small wineries, this discriminated against 98% of the country's wine and also allowed all of the in-state wineries to sell since they were all small. *Id.* at 5. The First Circuit found the law "significantly burdens out-of-state competitors" and reject that this favored out of state participants since most of the small wineries were located out of state. *Id.* at 10-11 (when "the effect of a state regulation is to cause local goods to constitute a larger share, and goods with an out-of-state source to constitute a smaller share, of the total sales in the market" the regulation is suspect). As such, and as applies here, the Court held that its "effect is to significantly alter the terms of competition between in-state and out-of-state wineries to the detriment of the out-of-state [breeders] that

18

produce 98 percent of the country's [animals]." *Id.* at 11. *See also Baude v. Heath*, 538 F.3d 608, 611-15 (7th Cir. 2008) ("[t]he statute is neutral in terms, but in effect it forbids interstate shipments direct to Indiana's consumers, while allowing intrastate shipments" because 93% of all wine comes from states that do not qualify under Indiana's laws).

Here, as in *Boude* and *Family Winemakers,* almost all of America's breeders have lost access to Cook County unless they are willing to establish a physical presence here. However, the impact on interstate commerce is even greater here than in *Boude* and *Family Winemakers* because the Ordinance was designed to stop the importation of animals by animal transporters and dealers *i.e.*, Class "B" dealer/breeders.    By prohibiting the Pet Shops from purchasing from the federally-licensed transporters of animals, Cook County structured the Ordinance to stop the interstate flow of commerce in its tracks.

Furthermore, unlike most goods like wine, one cannot put a puppy, kitten, or a rabbit in the mail and it is not reasonable to assume that Cook County residents will travel into other states to purchase an animal. As outlined above, the USDA has recently enacted rules based on the critical importance of "face to face" contact when purchasing an animal. The Ordinance, for all practical purposes, precludes this from happening unless a breeder is willing to establish a physical presence in Cook County, become subject to local licensing, obtain a facility here, and spend hundreds of thousands of dollars.

Prohibiting out of state breeders from selling to Pet Shops in Cook County (but continuing to allow local breeders to sell directly to consumers in Cook County) is tantamount to a state law that prohibits stores from selling milk but allowing dairy farmers to sell milk directly if it is produced "on the premises." Out-of-state producers have no local forum in which to sell their milk, so every customer that does not want to mail-order his milk in, or to drive to another

state to buy it, is compelled to buy from the local producer. And in fact, on that analogy, this case is similar to *Dean Milk Co. v. Madison*, 340 U.S. 349, 354 (1951), in which an importer and distributer of out-of-state milk challenged a city ordinance that made it unlawful to sell any milk as pasteurized unless it had been processed at a plant in the city. This was unlawful because it "in practical effect excludes from distribution in Madison wholesome milk produced and pasteurized in Illinois [by] erecting an economic barrier" *Id*.

　　If an out of state breeder wants to sell its animals here, it would need to move to Illinois and operate a facility here and even become licensed under the Illinois Animal Welfare Act and become subject to all of its laws and regulations. 225 ILCS 605/1 and 3. Cook County is undermining a nationwide federal practice of utilizing breeders who comply with Class "A" *and* Class "B" requirements. Imposing a selective modification is burdensome on interstate commerce. Even if evenhanded, the issue would be whether "the burden imposed on [interstate] commerce is clearly excessive in relation to the putative local benefits." *Dep't of Revenue of Ky.*, 553 U.S. at 338 (quoting *Pike*, 397 U.S. at 142). This is not a light inquiry either; "the extent of the burden that will be tolerated" depends "on whether it could be promoted as well with a lesser impact on interstate activities." *Pike*, 397 U.S. at 142; *Hunt v. Washington State Apple Adver. Comm'n*, 432 U.S. 333 (1977) (invalidating North Carolina law prohibiting the marking of commonly recognized grades on apples because North Carolina's law came into "conflict with the Commerce Clause's overriding requirement of a national "common market,'"); *Gov't Suppliers Consolidating Servs., Inc. v. Bayh*, 975 F.2d 1267 (7th Cir. 1992) (limits placed on items that could be carried in trucks used to haul municipal waste to landfills, as well as accompanying registration and stickering provisions, violated commerce clause).

The law also seeks to regulate lawful conduct outside of Illinois, namely to penalize those breeders who elect to follow USDA standards (and their own state's laws) and decide to have more breeders than Cook County finds moral. The law prohibits this. *See, BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 573 (1996) (it is not appropriate to create local laws with the intent to change conduct that is lawful in other states or "to deter conduct that is lawful in other jurisdictions.").[11] Cook County's attempt to change the breeding practices by putting large scale breeders out of business has a substantial impact on interstate commerce and is not appropriate.[12]

## V. Serious Questions Exist About Whether The Ordinance Violates Federal and State Equal Protection Rights

The Ordinance also violates the Plaintiffs' right to equal protection of the laws, U.S. Const. Amend. XIV, and of the Illinois Constitution of 1970 (Ill. Const. 1970, art. I, § 2) because it (a) prohibits highly-regulated Pet Shops from purchasing and selling animals that others (i.e., breeders and not for profits) are permitted to sell, (b) prohibits out of state breeders from selling dogs in Illinois when the same practice is permitted by in state breeders, and (c) allows certain Class "A" breeders to sell but prohibits all Class "B" breeders. Equal protection demands, at a minimum, that a statutory classification "bear a rational relationship to an independent and legitimate legislative end." *Romer v. Evans*, 517 U.S. 620, 633 (1996).

---

[11] *See also, Brown-Forman Distillers Corp. v. New York State Liquor Auth.*, 476 U.S. 573, 583 (1986)(a facially neutral law relating to the sale of liquor was found invalid because it impacted business practices in other states; even a facially neutral law that has the "practical effect" of controlling practices in other states can be invalid).

[12] The Ordinance also violates the Foreign Commerce Clause. U.S. Const. art. I, § 8, cl. 3 ("The Congress shall have power to ... regulate commerce with foreign nations ...."). *Nat'l Foreign Trade Council, Inc. v. Giannoulias*, 523 F. Supp. 2d 731, 747 (N.D. Ill. 2007). In July 2014, the federal government issued regulations about the importation of dogs from foreign countries and the requirements to do so. See https://www.federalregister.gov/articles/2014/08/18/2014-19515/animal-welfare-importation-of-live-dogs Sections 2.150 and 2.151 provide regulations about the requirements to import dogs and there are no breeder-size restrictions. In fact, it appears that no foreign dog could ever be sold in Cook County as the breeders are required to have a USDA license which conflicts with the federal government's regulations to foreign commerce.

*Six Kingdoms* found that while reducing stray animals is a respectable goal that it would not second guess, it held that "the Court is concerned [that] the ordinance gives special treatment to animal welfare organizations at the expense of retail establishments, in the form of privileges granted the former and burdens placed on the latter. This is uncomfortably close to the exact issue the Supreme Court has cautioned courts to investigate, that is, a legislative body acting to benefit one group of special interests at the expense of another." *Six Kingdoms Enterprises,* EP-10-CV-485-KC, 2011 WL 65864.

While rational basis review is generally deferential, "the standard is not a toothless one." *Illinois Sporting Goods Ass'n v. Cnty. of Cook*, 845 F. Supp. 582, 590 (N.D. Ill. 1994) (quoting *Mathews v. De Castro,* 429 U.S. 181 (1976)). Rather, "even in the ordinary equal protection case calling for the most deferential of standards, [the Court] insist[s] on knowing the relation between the classification adopted and the object to be obtained." *Romer*, 517 U.S. at 632; *see also Barletta v. Rilling*, 973 F. Supp. 2d 132, 138 (D.Conn. 2013).[13]

In *Illinois Sporting Goods*, the challenged ordinance regulated certain gun stores but not others. The plaintiffs alleged the ordinance classifications were under-inclusive in that they allowed certain businesses (i.e. large chains, pawn shops, and firearm dealers who owned their own stores) to continue to sell guns but excluded others (certain gun stores) from doing so. In entering a preliminary injunction, Judge Holderman held that: "The County has arbitrarily and irrationally excluded certain businesses that sell guns" but not others.[14]

---

[13] These principles serve to ensure that a statute is not drawn simply "for the purpose of disadvantaging the group burdened by the law." *Romer*, 517 U.S. at 633; *see also City of Cleburne, Tex. v. Cleburne Living Ctr.*, 473 U.S. 432, 450 (1985). While sometimes using the term "animus," the Court's disapproval extends to laws based on irrational prejudice, unease, "negative attitudes," "fear," "bias," or the "bare . . . desire to harm a politically unpopular group." *See Romer*, 517 U.S. at 633; *Cleburne*, 473 U.S. at 448, 450; *Palmore v. Sidoti*, 466 U.S. 429, 433 (1984); *Moreno*, 413 U.S. at 534.

[14] *See also United States v. Sampson*, 275 F. Supp. 2d 49, 89 n.19 (D. Mass. 2003); *accord Barletta v. Rilling*, 973 F. Supp. 2d 132, 138 (D.Conn. 2013) (statute invalid where it "is both grossly over-

In the same way, Cook County cannot establish that it is "necessarily or universally true that all [pet shops or breeders] in [their] subclass would be unable to establish" that they do not sell "puppy mill" dogs, nor can the County "suggest a basis for the assumption that" other sources do not. "[T]he potential for [sale of "puppy mill" dogs] is the same as to both"—or more accurately, there is actually a far greater potential for the sale of such dogs from other sources than a regulated and accountable pet shop and breeders like the Plaintiffs here. The Supreme Court also emphasized that a "blanket and conclusive exclusion" under the law is particularly suspect. *Romer,* 517 U.S. at 636. Here, the Ordinance from a practical standpoint works a "blanket and conclusive exclusion" of (a) Pet Shops, (b) out of state breeders, and (c) all Class B license holders and it "would not serve the purposes of the [Ordinance] to conclusively deny them an opportunity to establish" that they do not sell "mill" animals.

The Ordinance on its face demonstrates that it was designed to prevent consumers from purchasing from the Pet Shops as it states it "will not affect a consumer's ability to obtain a dog or cat of his or her choice directly from a breeder, a breed-specific rescue organization or a shelter." The Pet Shops are similarly situated to shelters/rescues and breeders; each displays, sells, and transfers the ownership of puppies to consumers and each is just as capable as any of the others of acquiring dogs from "mills" (Pet Shops are, in fact, much *less* likely due to stringent state regulation). Only allowing the Pet Shops to purchase from certain Class A breeders and no Class B breeders (regardless of size) also is without a basis.  As such, the Ordinance indiscriminately prohibits sales of all commercially bred dogs by responsible Pet Shops, out of state breeders, and Class B license holders. The lack of congruence between means and ends gives rise to a strong inference that the Ordinance was enacted "for the purpose of

---

inclusive and grossly under-inclusive as a proxy for serving the State's stated goals"); *Jimenez v. Weinberger*, 417 U.S. 628, 630 (1974) (Social Security Act provision invalidated based upon classification).

23

disadvantaging the group burdened by the law." *Romer*, 517 U.S. at 633; *see also City of Cleburne, Tex. v. Cleburne Living Ctr.*, 473 U.S. 432, 450 (1985).

## VI.   Serious Questions Exist About Whether The Ordinance Exceeds Cook County's Power As A Local Governmental Entity.

As recognized repeatedly in the Ordinance itself, the elimination of "puppy mills" is a state-wide and national problem and therefore is not appropriate for Cook County to regulate.[15] This is particularly the case because breeders and pet shops are already regulated heavily on a federal and state level. "Courts of our state have not hesitated . . . to strike down home rule ordinances where it is determined that the ordinances do not pertain to the government and affairs of a local unit." *Chicago Bar Ass'n v. Cook Cnty.*, 124 Ill. App. 3d 355, 360, *aff'd*, 102 Ill. 2d 438 (1984); *Bridgman v. Korzen*, 4 Ill. 2d 74 (1972). Of course, local governmental entities have long had the power to regulate in the area of animal regulations. *See e.g., DeHart v. Town of Austin*, 39 F.3d 718 (7th Cir. 1994) (ordinance prohibiting dangerous animals capable of inflicting death or physical harm to human is appropriate beings because federal law does "not prohibit any [other governmental entities] from promulgating standards in addition to those standards promulgated by the Secretary."). Respectfully, as explained above, the Ordinance goes further and undermines a nationwide pet distribution scheme by, *inter alia*, prohibiting those who are approved and licensed to transport and breed dogs under their own state's laws and federal law. The Illinois Department of Agriculture explains its functions on its Internet site:

> **Who oversees animal welfare in Illinois?** The Illinois Department of Agriculture Bureau of Animal Health and Welfare administers regulations concerning animal welfare. Bureau officials license and inspect animal-related businesses, including pet shops, breeding and boarding kennels, and shelters. . . . The Animal Welfare Act provides

---

[15] The Ordinance's "whereas" clauses, demonstrate that this is a state-wide and nationwide problem (i.e., Pet Shops are a **"**sales outlet for young dogs, cats, and rabbits bred commercially in *puppy mills*, *kitten mills*, and *rabbit mills* both **within the United States** and abroad . . . it is estimated that 10,000 puppy mills produce more than 2,400,000 puppies a year in the United States . . . every year millions of cats and dogs are euthanized in our **nation's** animal shelters").

for inspection and licensure of facilities that produce or offer certain animals for sale or adoption. Inspections ensure compliance with sanitation and animal health requirements. Several types of facilities are regulated under this act, including pet shops, dog dealers, breeding and boarding kennels, catteries… http://www.agr.state.il.us/AnimalHW/awflaws.html.

Facilities that breed and sell their animals to pet stores are required to obtain a license from USDA. 7 USC § 2131. Just last year, the Illinois passed the "Puppy Lemon Law," P.A. 98-593. There are now highly regulated requirements for disclosures that must be made by the Pet Shops. 225 ILCS 605/3.15. As such, the Ordinance is preempted by both Illinois and federal law and exceeds the power of Cook County.[16]

## VII.    Serious Questions Exist About Whether The Ordinance Impairs Contracts.

The Plaintiffs' contracts are impaired by the Ordinance and an injunction is appropriate while this action is pending. *See*, *Six Kingdoms Enterprises,* EP-10-CV-485-KC, 2011 WL 65864 (preliminary injunction entered based upon an impairment of contracts theory arising out of a Petland franchisee's contractual obligations). The U.S. Const. art. I, § 10 provides that states may not "pass any . . . law impairing the Obligation of Contracts."[17] *Six Kingdoms* found it problematic that the pet shop would violate its contract if forced to comply with the applicable

---

[16] Unlike the Ordinance, the Animal Welfare Act allows the Pet Shops to receive dogs from non-USDA licensed breeders. 225 ILCS 605/3.15 ("*If* the dog or cat breeder also holds a license issued by the United States Department of Agriculture")(emphasis added).

[17] The Contracts Clause is violated if a "change in state law has 'operated as a substantial impairment of a contractual relationship.'" *General Motors Corp. v. Romein,* 503 U.S. 181, 186 (1992). As recognized in *Six Kingdoms*, "[t]he Supreme Court has set forth a three-step procedure for analyzing federal constitutional claims that a state law impairs contractual obligations." *Six Kingdoms Enterprises,* EP-10-CV-485-KC, 2011 WL 65864, at *4. "First, the threshold inquiry is whether the state law has, in fact, operated as a substantial impairment of a contractual relationship." *Id.* "Total destruction of contractual expectations is not necessary for a finding of substantial impairment." *Id.* Next, courts "examine the state's asserted justification for the impairment, which must be a significant and legitimate public purpose." *Id.* The state must be attempting to remedy "a broad and general social or economic problem." *Id.* Third, if the public purpose is adequate, courts then must consider "whether the challenged law was 'reasonably necessary' to achieve the purpose." *Id.*

ordinance that required the disclosure of pricing. The Court held that "the impairment is substantial, because the impairment could lead to the complete loss of the franchise." *Id.* at *6.

The Pet Shops have entered into thousands of warranty/contracts that they cannot honor under the Ordinance; nor can they comply with the state's mandated warranty. (Exhibit F, Star Affidavit, ¶ 27-28; Exhibit H, Maciejewski Affidavit, ¶ 27-28; Exhibit I, Ronald Berning Affidavit, ¶¶ 23-27). No longer will the Pet Shops be able to provide a "replacement puppy of equal value" due to the limited sourcing and because they will be out of business. Likewise, Happiness is contractually obligated to purchase 100% of the puppies produced by several Amish breeders who are now prohibited sources. (Exhibit I, Ronald Berning Affidavit, ¶ 27). Finally, the Pet Shops all have long term lease agreements and the Petland entities are locked into 20 year franchise agreements under which they will default. (Exhibit F, Star Affidavit, ¶ 27-28; Exhibit H, Maciejewski Affidavit, ¶ 27-28; Exhibit I, Ronald Berning Affidavit, ¶ 26).

## VIII.  The Ordinance Is Unconstitutionally Vague.

The Ordinance is vague because it is not clear as to whom it applies and its applicable standards. An ordinance may be found to be unconstitutionally vague if (1) the ordinance "does not provide a person of ordinary intelligence a reasonable opportunity to know what is prohibited," or (2) the ordinance "fails to provide explicit standards to prevent arbitrary and discriminatory enforcement by those enforcing the [ordinance]." *United States v. Lim,* 444 F.3d 910, 915 (7th Cir. 2006).[18] Here are the ways that the Ordinance is unconstitutionally vague:

### A.    Applicability Clause:    The Ordinance states:

---

[18] *Penny Saver Publications, Inc. v. Vill. of Hazel Crest*, 905 F.2d 150, 155 (7th Cir. 1990) (ordinance impermissibly failed to inform of the specific conduct prohibited); *Gowder v. City of Chicago,* 923 F. Supp. 2d 1110, 1114-15 (N.D. Ill. 2012) (firearm ordinance does not provide a person of ordinary intelligence a reasonable opportunity to know what is prohibited where City of Chicago borrowed from a state law the term "unlawful use of a weapon").

This section shall apply to all areas within Cook County, Illinois, except those areas which are governed by an ordinance of another governmental entity (which by law may not be superseded by this section).

This applicability section is unconstitutionally vague because all parts of Cook County are governed by "another governmental entity," namely the Illinois, the United States, and various municipalities. This section is vague because it is unclear about what type of "ordinance" it is referring, i.e., an animal control ordinance, any ordinance? It is unclear why there are parentheses used in this section.

**B.     Lack of Definitions:**   The allowed animal sources are largely undefined. There is no definition of a humane society or most of the other allowed sources. For example, "humane society" is defined in part by Merriam Webster as "a society concerned with the promotion of humane conduct." Everyone can have a difference of opinion as to what constitutes "humane conduct." Is the Amish community from whom Happiness o=sources a humane society? They are humane (they treat animals well) and are a society (the Amish community).

**C.     Contradictory Punishment Section:**       Section     10-3     is     internally inconsistent as it states that any person violating "any provision of this chapter [can be fined and imprisoned]." Two sentences later, it states that a violation of Section 10-13 "shall be subject to a fine of $500 for each violation."   On one hand, it appears that the Ordinance appears to take away the threat of incarceration by making a separate rule for Section 10-13 violations, but on the other hand the Ordinance allows imprisonment for the violation of "any provision."

**IX.     Public Interest Weighs in Favor of an Injunction And A Zero Bond is Appropriate.**

"[I]t is always in the public interest to prevent the violation of a party's constitutional rights." *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012) (quoting *Sammartano v. First Judicial District Court*, 303 F.3d 959, 974 (9th Cir. 2002). The public "can only be served . . . by

enjoining enforcement of the amended ordinances, which are potentially constitutionally deficient." *Doctor John's, Inc. v. City of Sioux City, Iowa*, 305 F. Supp. 2d 1022, 1042 (N.D. Iowa, 2004). The Ordinance also runs contrary to the state and federal policies to regulate, not to ban, the sales of commercially-bred puppies through Pet Shops. Likewise, the Court should set a zero or nominal bond as there will be no damages to Cook County and bonds are not generally required to enjoin potentially unconstitutional conduct.

## <u>CONCLUSION</u>

WHEREFORE, for the foregoing reasons, Plaintiffs respectfully request this Court enter a preliminary injunction and temporary restraining order against Defendants and grant all other relief this court deems just and appropriate.

Dated: September 8, 2014                    Respectfully Submitted,


By:  /s/ David J. Fish
                    One of Plaintiffs Attorneys

David Fish
Monica Fazekas
The Fish Law Firm, P.C.
55 S. Main Street, Suite 341
Naperville, IL 60540
630.355.7590
www.fishlawfirm.com