# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

MISSOURI PET BREEDERS ASSOCIATION, )
STARFISH VENTURES, INC. d/b/a )
Petland of Hoffman Estates, DAN STAR, )
and JANET STAR; HAPPINESS IS PETS OF )
ARLINGTON HEIGHTS, INC., )
RONALD BERNING; J & J MANAGEMENT, )
INC. d/b/a Petland of Chicago Ridge, )
and JAMES MACIEJEWSKI, )
            )
        Plaintiffs, )
            )
      vs. )      No. 14 C 6930
            )
COUNTY OF COOK, )
TONI PRECKWINKLE, )
and DONNA ALEXANDER, )
            )
        Defendants. )

## MEMORANDUM OPINION AND ORDER

MATTHEW F. KENNELLY, District Judge:

Plaintiffs, the Missouri Pet Breeders Association (MPBA) and three Cook County pet shops and their owners, have sued Cook County, the President of the Cook County Board of Commissioners, and the Director of Cook County Animal & Rabies Control, alleging that a Cook County ordinance regulating the sale of dogs, cats, and rabbits by pet stores in the County violates the United States and Illinois Constitutions. Defendants have moved to dismiss the complaint pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). The Court grants defendants' motion for the reasons stated below.

**Background**

For purposes of the motion to dismiss, the Court accepts as true the following facts alleged in plaintiffs' complaint.  *See Fortres Grand Corp. v. Warner Bros. Entm't Inc.*, 763 F.3d 696, 700 (7th Cir. 2014).  The Cook County Board of Commissioners passed the Cook County Companion Animal and Consumer Protection Ordinance (Ordinance No. 14-2408) in April 2014.  Although the ordinance was scheduled to take effect on October 1, 2014, the Court entered an agreed order on September 11, 2014 deferring enforcement of the ordinance during the pendency of this litigation.

The ordinance regulates the sales of dogs, cats, and rabbits by pet stores located in Cook County, Illinois.  Under the ordinance, a "pet shop operator" may only sell animals obtained from a breeder that (among other requirements) holds a USDA class "A" license and "owns or possesses no more than five (5) female dogs, cats, or rabbits capable of reproduction in any twelve (12) month period."  Cook County, Ill., Rev. Ordinances ch. 10, art. I, § 10-13(a)(3) (2014).[1]

The ordinance defines "pet shop operator" by reference to the Illinois Animal Welfare Act (IAWA).  *Id.* § 10-2.  A "pet shop operator" under the IAWA is "any person who sells, offers to sell, exchange, or offers for adoption with or without charge or donation dogs, cats, birds, fish, reptiles, or other animals customarily obtained as pets in this State," unless that person "sells only such animals that he has produced and raised."  225 ILCS 605/2.  Although the IAWA definition is expansive, the Cook County

---

[1] The Court may take judicial notice of the ordinance without converting defendants' motion to dismiss into a motion for summary judgment.  *See Newcomb v. Brennan*, 558 F.2d 825, 829 (7th Cir. 1977) ("We hold that matters of public record such as state statutes, city charters, and city ordinances fall within the category of 'common knowledge' and are therefore proper subjects for judicial notice.").

ordinance exempts local not-for-profit entities (including humane societies and rescue organizations) and government-run entities (including animal control centers, animal care facilities, kennels, pounds, and training facilities) from the restrictions placed on pet shop operators. Cook County, Ill., Rev. Ordinances ch. 10, art. I, § 10-13(b). Accordingly, those entities can sell pets directly to consumers without regulation. Additionally, pet stores may obtain pets from not-for-profit and government-run entities without any restrictions. *Id.* § 10-13(a)(1).

Plaintiffs in this case are the Missouri Pet Breeders Association (MPBA), a professional pet organization that advocates for the interests of its member pet breeders, and three Cook County pet shops and their owners. The pet stores claim that they will go out of business if the ordinance takes effect, because there are not enough breeders that meet the ordinance's requirements to supply the desired number of specialty pets to Cook County pet stores. Am. Compl. ¶¶ 56–58. Specifically, they claim that very few breeders have five or fewer female dogs, so pet stores purchase most of the pets they sell from breeders with more than five dogs. Of the breeders that currently have five or fewer dogs, plaintiffs say, very few have the required class A license, because the United States Department of Agriculture (USDA) does not require breeders with four or fewer female dogs to obtain a license. If the ordinance takes effect, plaintiffs claim, there will not be enough breeders to meet consumers' demands for pure- and specialty-breed pets. For instance, plaintiffs say, there will only be three grade A-licensed breeders in Illinois that meet the ordinance's requirements. *Id.* ¶ 56. Plaintiffs have not indicated how difficult it would be for existing breeders to obtain a class A license. They admit that "[t]heoretically, a breeder with fewer than 5 dogs could

ask the USDA to regulate them" but state that "next to none do so because they are legally exempt from requiring a USDA license." *Id.* ¶ 42.

Plaintiffs also claim that the ordinance will impact out-of-state breeders, including the Missouri breeders that MPBA represents. Even though breeders are not directly regulated, plaintiffs contend that the ordinance would "ban[] local pet shops from selling puppies imported from 98% of America's breeders." *Id.* ¶ 76. Moreover, plaintiffs claim that the ordinance will cause out-of-state pet breeders to lose business to in-state pet breeders. Specifically, they assert that because the ordinance does not regulate sales from breeders to consumers, breeders without licenses will be able to sell to Cook County residents without restriction even if they house more than five female dogs. Thus, Cook County residents who want specialty breeds and cannot find them at pet stores (because the supply at Cook County pet stores will be depleted by the regulation) will instead purchase dogs directly from breeders. Although the ordinance does not distinguish between Illinois and out-of-state breeders, plaintiffs contend that Illinois breeders will gain business from Cook County customers. According to plaintiffs, Cook County "consumers will often want to see an animal before making a purchasing decision" but "are not likely to travel into another state to purchase an animal if they can purchase directly from a breeder located in Illinois." *Id.* ¶ 50. Thus, out-of-state breeders will be forced to either lose business to Illinois breeders or establish a physical presence in Cook County. *Id.* ¶¶ 50, 76.

Plaintiffs claim that the ordinance violates the U.S. Constitution because it impermissibly burdens interstate and foreign commerce (count 1), violates plaintiffs' equal protection rights (count 2), and is impermissibly vague (count 4). Plaintiffs also

contend that the ordinance is preempted by state and federal law and that the county has exceeded its home rule powers under the Illinois Constitution (count 3). The pet shops and their owners (but not MPBA) contend that the ordinance violates the Contract Clause of the U.S. Constitution (count 5). And finally, plaintiffs request a permanent injunction enjoining defendants from enforcing the ordinance against them (count 6).

## Discussion

When considering a motion to dismiss, the Court accepts plaintiffs' allegations as true and draws reasonable inferences in their favor. *Parish v. City of Elkhart*, 614 F.3d 677, 679 (7th Cir. 2010). In order to state a viable claim, plaintiffs must provide "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is plausible on its face if "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

A.    **Standing**

Defendants argue that certain claims must be dismissed for lack of standing under Federal Rule of Civil Procedure 12(b)(1).

1.    **MPBA's standing**

Defendants argue that MPBA does not meet the constitutional or prudential requirements for standing. MPBA does not challenge defendants' contention that it lacks standing to sue on its own behalf under Article III. To sue in its own right, MPBA must establish that the organization itself suffered a concrete and particularized injury that is traceable to defendants' challenged actions and would be redressed by a favorable decision. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992).

MPBA does not allege that it has suffered any injury itself; it only alleges injuries to its members.  Thus, it has not met the minimum constitutional requirements for standing to sue on its own behalf.  *See Milwaukee Police Ass'n v. Bd. of Fire & Police Comm'rs of Milwaukee*, 708 F.3d 921, 926–27 (7th Cir. 2013).

MPBA does, however, have standing to sue on behalf of its members, Missouri pet breeders.  An association has Article III standing to sue on behalf of its members when "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit."  *Hunt v. Wash. State Apple Adver. Comm'n*, 432 U.S. 333, 343 (1977).

First, MPBA's members would have standing to sue under Article III.  They allege a concrete and imminent injury, namely, that they will lose sales if the ordinance takes effect.  Specifically, MPBA alleges that the ordinance will cause Missouri breeders to sell fewer pets to Cook County pet stores.  They also claim that they will lose business to Illinois breeders, because consumers will choose to buy more pets directly from breeders but will be more likely to go to Illinois breeders due to geographical convenience.  Although the effect is indirect, as the Court describes below in considering plaintiffs' Commerce Clause claim, MPBA has articulated a sufficiently concrete injury to its breeders to satisfy the requirements of Article III.  *See, e.g.*, *Alliance for Clean Coal v. Miller*, 44 F.3d 591, 594–95 (7th Cir. 1995) (ruling that a trade association whose members included Colorado and Oregon coal companies had alleged an injury-in-fact by claiming that the challenged legislation would make utilities

less likely to use western coal).

Second, MPBA seeks to protect interests that are germane to the association's purpose. MPBA "exists, in part, to advocate for the interests of its members," and the association filed this lawsuit to protect those interests. Am. Compl. ¶ 9.

Finally, MPBA can represent the interests of its members without their individual participation. When an "association seeks a declaration, injunction, or some other form of prospective relief, it can reasonably be supposed that the remedy, if granted, will inure to the benefit of those members of the association actually injured." *Warth v. Seldin*, 422 U.S. 490, 515 (1975). Accordingly, "'individual participation' is not normally necessary when an association seeks prospective or injunctive relief for its members." *United Food & Commercial Workers Union Local 751 v. Brown Grp., Inc.*, 517 U.S. 544, 546 (1996) (citing *Hunt*, 422 U.S. at 511). Here, plaintiffs have requested declaratory and injunctive relief, which would likely benefit all MPBA members if granted. Thus, MPBA has standing to sue on behalf of its members under Article III.

"In addition to the constitutional limitation on standing, courts also impose 'prudential limitations' on the class of persons who may invoke federal jurisdiction. Among these prudential restrictions is the general rule that a litigant must assert his own legal rights and cannot assert the legal rights of a third party." *Massey v. Helman*, 196 F.3d 727, 739 (7th Cir. 1999) (internal citation omitted). Defendants contend that MPBA cannot sue to enforce the rights of others. Contrary to defendants' assertion, MPBA has not asserted the rights of others. With the exception of certain individual allegations that relate to other parties' rights, which the Court discusses in more detail below, MPBA seeks to assert the rights of Missouri pet breeders.

### 2. Standing to raise Foreign Commerce Clause claim

All of the plaintiffs lack standing to raise a Foreign Commerce Clause challenge. Plaintiffs argue that the ordinance violates the Foreign Commerce Clause by impermissibly burdening foreign commerce. U.S. Const. art. I, § 8, cl. 3. Specifically, plaintiffs allege that the ordinance conflicts with federal regulations governing the importation of dogs from foreign countries and effectively prevents pet stores from obtaining pets from foreign countries. Am. Compl. ¶ 81. Neither party has alleged a sufficiently concrete and particularized injury to establish standing to raise the Foreign Commerce Clause challenge under Article III. MPBA lacks standing, because Missouri breeders do not have any personal interest in whether foreign breeders are allowed to sell pets to Cook County pet stores. The pet stores and their owners also lack standing, because none of them have alleged that they actually purchase animals from foreign breeders. Thus plaintiffs have not alleged any concrete and particularized injury. *See Lujan*, 504 U.S. at 560.

### 3. Third-party standing

Many of the individual claims actually contemplate multiple constitutional violations. Some of the claims implicate the Missouri pet breeders' rights, whereas others implicate the Cook County pet stores' rights. For instance, in their equal protection claim, plaintiffs challenge the distinction between pet stores (whose sales are regulated) and not-for-profits and breeders (whose sales are not regulated). This allegation implicates the pet stores' rights. Plaintiffs also challenge the distinction between different types of breeders, namely, the distinction between licensed breeders and the practical distinction between in-state and out-of-state breeders. These

allegations partially implicate the breeders' rights.

Generally, a party cannot assert the rights of another unless "the party asserting the right has a close relationship with the person who possesses the right" and "there is a hindrance to the possessor's ability to protect his own interests." *Kowalski v. Tesmer*, 543 U.S. 125, 130 (2004) (internal quotation marks omitted). The Court need not determine whether each plaintiff has standing to pursue each individual claim, however, because for every claim "we have at least one individual plaintiff who has demonstrated standing to assert these rights as his own." *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 264, 264 n.9 (1977); *see also Watt v. Energy Action Educ. Found.*, 454 U.S. 151, 160 (1981).

Having concluded that plaintiffs have standing to pursue all of their claims, with the exception of the Foreign Commerce Claim, the Court turns to defendants' argument that plaintiffs have failed to state any claim upon which relief can be granted.

**B.      Home rule powers and federal and state preemption**

Plaintiffs claim that the ordinance is preempted by state and federal law and that that the ordinance exceeds Cook County's home rule powers under the Illinois Constitution. Am. Compl. ¶¶ 93–103.

Article VII of the Illinois Constitution states that a home rule unit such as Cook County "may exercise any power and perform any function pertaining to its government and affairs including, but not limited to, the power to regulate for the protection of the public health, safety, morals and welfare." Ill. Const. art. 7, § 6(a). To determine whether a municipality has exceeded its home rule powers by legislating in an area of statewide concern, courts consider "the nature and extent of the problem, the units of

government which have the most vital interest in its solution, and the role traditionally played by local and statewide authorities in dealing with it." *Kalodimos v. Vill. of Morton Grove*, 103 Ill. 2d 483, 501, 470 N.E.2d 266, 274 (1984). The Illinois Constitution gives home rule units "the broadest powers possible." *Scadron v. City of Des Plaines*, 153 Ill. 2d 164, 174, 606 N.E.2d 1154, 1158 (1992).

Plaintiffs argue that Cook County may not regulate animal breeding and sales because the state legislature has the exclusive power to enact laws in that area. Although the Illinois General Assembly has passed laws related to animal sales and welfare, including the Illinois Animal Welfare Act, the Illinois Animal Control Act, and the Illinois Puppy Lemon Law, the Illinois Constitution grants counties the power to "exercise and perform concurrently with the State any power or function of a home rule unit to the extent that the General Assembly by law does not specifically limit the concurrent exercise or specifically declare the State's exercise to be exclusive." Ill. Const. art. 7, § 6(i). Illinois has not expressly barred local governments from exercising power in the field of animal control. In fact, a provision of the Illinois Animal Control Act states that the statute "shall [not] . . . be construed to, in any manner, limit the power of any municipality or other political subdivision to further control and regulate dogs, cats or other animals in such municipality or other political subdivision provided that no regulation or ordinance is specific to breed." 510 ILCS 5/24; *see also Cnty. of Cook v. Vill. of Bridgeview*, 2014 IL App (1st) 122164, ¶ 14, *appeal denied*, No. 117260, 2015 WL 427141 (Ill. App. Ct. Jan. 28, 2015) ("In Illinois, the problem of animal control, overpopulation, and the spread of rabies is both a local and statewide concern."). Although the Illinois Puppy Lemon Law and Animal Welfare Act do not have a similar

limitation, neither statute includes "specific language limiting or denying the power or function" of home rule units.  5 ILCS 70/7 ("No law enacted after January 12, 1977, denies or limits any power or function of a home rule unit . . . unless there is specific language limiting or denying the power or function and the language specifically sets forth in what manner and to what extent it is a limitation on or denial of the power or function of a home rule unit.").  Because both state and local governments have a vital interest in animal control, and the Illinois legislature has not barred local governments from exercising their home rule powers in this area, Cook County may regulate animal breeding and sales as part of its home rule authority.

To determine whether a local law is preempted by Illinois law, courts must "determine whether the legislature has specifically limited the concurrent exercise of this power or specifically declared that the state's exercise of this power is exclusive."  *See City of Chicago v. Roman*, 184 Ill. 2d 504, 515, 705 N.E.2d 81, 88 (1998).  Thus, the ordinance is not preempted under state law for the same reasons that it is a valid exercise of home rule power.

Plaintiffs also claim that the federal Animal Welfare Act (AWA) and related regulations preempt the ordinance.  Federal preemption occurs in three situations:  (1) when Congress has expressly stated that a federal statute preempts state or local law; (2) "when a pervasive scheme of federal regulation makes it reasonable to conclude that Congress intended exclusive federal regulation of the area;" and (3) when "state or local law actually conflicts with federal law."  *DeHart v. Town of Austin*, 39 F.3d 718, 721 (7th Cir. 1994).  Plaintiffs acknowledge that the Seventh Circuit has rejected federal preemption challenges to local animal regulations but argue that this ordinance "goes

much further" because it was "designed to stop the importation of animals in interstate commerce—which is directly contrary to the AWA's stated purpose of 'prevent[ing] and eliminat[ing] burdens upon [the free flow of] commerce.'" Pls.' Resp. to Defs.' Mot. to Dismiss at 23 (citing 7 U.S.C. § 2131).

The Court agrees with defendants that *DeHart* forecloses plaintiffs' federal preemption claim. In that case, a seller of exotic animals claimed that the AWA preempted a local ordinance that banned possession and ownership of wild and dangerous animals. *DeHart*, 39 F.3d at 720–21. The court held that the AWA did not preempt the ordinance, because the AWA "expressly contemplates state and local regulation of animals." *Id.* at 722–23. The court pointed to the AWA's provision stating that the AWA "shall not prohibit any State (or a political subdivision of such State) from promulgating standards in addition to those standards promulgated by the Secretary." *Id.* at 722 (quoting 7 U.S.C. § 2143(a)(8)). The court also noted that animal welfare is "an area of regulation within the historic police powers of a municipality." *Id.*

As in *DeHart*, none of the three types of preemption apply in this case. Congress has not expressly limited the power of state or local governments to regulate in this area. Preemption cannot be inferred, as there is no indication that Congress intended exclusive federal regulation in the area. To the contrary, Congress expressly contemplated local regulation of animal welfare. *See* 7 U.S.C. § 2143(a)(8). Moreover, the USDA, the agency authorized to promulgate rules under the statute, 7 U.S.C. § 2151, has encouraged local governments to enact laws related to animal protection. *See* APHIS Fact Sheet (Feb. 2014), *available at* www.aphis.usda.gov/publications/animal_welfare/content/printable_version/faq_animal_

dealers.pdf ("States and local governments may create and enforce their own laws and regulations to protect animals, which may exceed the AWA standards.").  (The Court may take judicial notice of information published on federal agencies' websites, provided the accuracy of the content can readily be determined and cannot reasonably be questioned.  *See Denius v. Dunlap*, 330 F.3d 919, 926 (7th Cir. 2003); *Laborers' Pension Fund v. Blackmore Sewer Const., Inc.*, 298 F.3d 600, 607 (7th Cir. 2002).)

Finally, the ordinance does not conflict with the AWA or federal regulations.  An ordinance is not preempted merely because it will hurt local businesses economically.  The court in *DeHart* concluded that even if the local ban on wild animal ownership "produces onerous consequences for DeHart's business, preemption is not established."  *DeHart*, 39 F.3d at 722.  The court stated that there was no conflict preemption because "DeHart has not shown that it is physically impossible to comply with both the federal and local regulations."  *Id.*  The Cook County ordinance is even easier to comply with than the complete ban on wild animal ownership at issue in *DeHart.*  A Cook County pet store operator could comply with the ordinance and federal law by sourcing from small, licensed breeders.  And breeders could comply with the ordinance by reducing the number of female animals on their premises and obtaining the necessary licenses.

In sum, the Court dismisses plaintiffs' claims alleging state and federal preemption and violation of the home rule provisions of the Illinois Constitution (count 3).

C.    **Equal Protection**

Plaintiffs claim that the ordinance violates their right to equal protection under the

Illinois and U.S. Constitutions. The Court considers both claims together, as state and federal equal protection claims are analyzed under the same standard. *See Wauconda Fire Prot. Dist. v. Stonewall Orchards, LLP*, 214 Ill. 2d 417, 434, 828 N.E.2d 216, 226 (2005).

Plaintiffs allege that the ordinance impermissibly distinguishes between groups in three ways: (1) Cook County pet shops may not sell pets obtained from certain breeders, whereas breeders, not-for-profits, and government entities may sell pets directly to consumers without regulation; (2) out-of-state breeders will have difficulty selling animals to Cook County consumers because of geographic constraints, whereas in-state breeders will easily sell to Cook County consumers; (3) breeders with class A licenses issued by the USDA may sell animals to Cook County pet stores (provided they have five or fewer female animals), whereas breeders with class B licenses may not. Am. Compl. ¶ 84.

The parties agree that these classifications are subject to rational-basis review, because the ordinance does not distinguish based on a suspect classification or implicate a fundamental liberty interest. *See FCC v. Beach Commc'ns, Inc.*, 508 U.S. 307, 313 (1993). Accordingly, the ordinance is presumed to be valid and will be upheld "if there is any reasonably conceivable state of facts that could provide a rational basis for the classification[s]." *Id.* at 313–14. The motivations of legislators are not relevant to this analysis. *Id.* at 315. No evidentiary proceedings are necessary if lawmakers have presented some conceivable rational basis for a law, because "[o]utside the realm of 'heightened scrutiny' there is [ ] never a role for evidentiary proceedings." *Nat'l Paint & Coatings Ass'n v. City of Chicago*, 45 F.3d 1124, 1127 (7th Cir. 1995).

Defendants have offered "plausible reasons" justifying the challenged classifications. *Beach Commc'ns, Inc.*, 508 U.S. at 313 (internal quotation marks omitted). The ordinance was passed to "[p]rotect[ ] animals from improper use, abuse, neglect, inhumane treatment and health hazards, particularly rabies." Cook County, Ill., Rev. Ordinances ch. 10, art. I, § 10-1(2). Specifically, the Board of Commissioners determined that puppy mills—"mass-breeding facilities that churn out puppies with an emphasis on profit over welfare"—"usually house dogs in overcrowded and unsanitary conditions without adequate veterinary care, food, water and socialization." Pmbl. to Cook County, Ill. Ordinance Amend. No. 14-2408 (Apr. 9, 2014). The commissioners concluded that "the inhumane conditions in puppy and kitten mill facilities lead to health and behavioral issues as well as congenital and hereditary illness and disease." *Id.* Lawmakers imposed breeder-size requirements to ensure that pet stores bought animals from small breeders as opposed to inhumane mass-breeding facilities.

Plaintiffs contend that the ordinance is underinclusive, because it prevents pet stores from selling animals raised in large breeding facilities but "fail[s] to ban the very same sales [ ] from other sources, such as local breeders, retailers that are not a 'Pet shop operator' under the [o]rdinance, internet or other remote sellers, and even animal shelters or 'rescue' organizations that, wittingly or unwittingly, can end up buying 'puppy mill' puppies and passing them on to consumers." Am. Compl. ¶ 88. But a law need not completely eliminate the perceived problem to satisfy the rational-basis standard. *See Minnesota v. Clover Leaf Creamery Co.*, 449 U.S. 456, 466 (1981). A government entity may implement legislation "step by step" by "adopting regulations that only partially ameliorate a perceived evil and deferring complete elimination of the evil to

future regulations." *City of New Orleans v. Dukes*, 427 U.S. 297, 303 (1976). The ordinance's breeder-size limitations are plausibly designed to reduce the number of animals sold in Cook County that are obtained from mass-breeding facilities. This restriction is rationally related to a legitimate government interest, even if it does not include all animals from mass-breeding facilities.

Plaintiffs' contention that the ordinance has a disparate effect on out-of-state breeders compared to in-state breeders also cannot survive rational-basis review. Plaintiffs argue that in-state breeders will have greater access to Cook County customers who want to buy a pet but do not want to travel far to see it. Even if there is such an effect, the decision to only restrict pet stores' direct sales rather than breeders' direct sales to customers can be explained as an incremental step to eliminate mass-breeding facilities. The ordinance does not raise equal protection concerns, even if it will not completely solve the problems it was intended to address. Any disparate effect that stems from the distinction between sales by breeders and sales by pet stores is rationally related to the legitimate government interest of limiting the use of mass-breeding facilities.

Plaintiffs also argue that the ordinance impermissibly distinguishes between breeders with class A and class B USDA licenses, because a pet store may purchase from a breeder with a class A license but not any other license. The USDA issues class B licenses to dealers that purchase and resell animals, typically those that transport animals across state lines. Am. Compl. ¶ 51; *see also* 9 C.F.R. § 1.1. Pet shops are affected by the ordinance's licensing requirement, because class B dealers "serve as a critical source for pet stores to obtain their animals from other states." Am. Compl. ¶ 53.

The classification between breeders with Class A licenses and those with other licenses is rationally related to Cook County's interest in protecting animals from "improper use, abuse, neglect, inhumane treatment and health hazards."  Cook County, Ill., Rev. Ordinances ch. 10, art. I, § 10-1(2).  Class A licensees only sell animals "that are bred and raised on the premises in a closed or stable colony."  9 C.F.R. § 1.1.  If the purpose of the ordinance is to ensure that animals are raised in humane conditions, it makes sense to remove barriers between the consumer and the place where the pet was raised.  A dealer that merely transports animals may not have the same knowledge of the animal's upbringing as compared to a breeder that raises the animals on its premises.  Thus, the Court concludes that there are plausible reasons for the County to require pet stores to sell animals only from those breeders who have a class A license.

Finally, the Court finds meritless plaintiffs' argument that the ordinance is "actually counterproductive" because it encourages consumers to purchase from unlicensed and unregulated brokers.  Am. Compl. ¶ 89.  The Court is also unpersuaded by their argument that the ordinance is overinclusive because it prevents pet shops from selling animals from certain reputable breeders that treat animals humanely.  *Id.* ¶ 87. The Court may not assess the "correctness of [ ] legislative judgments" as part of rational-basis review.  *Clover Leaf Creamery Co.*, 449 U.S. at 464.  Rather, plaintiffs "must convince the court that the legislative facts on which the classification is apparently based could not reasonably be conceived to be true by the governmental decisionmaker."  *Id.*  Even assuming the facts alleged in the complaint are true, they are unconvincing in this context.  Because a legislative decision "may be based on rational speculation unsupported by evidence or empirical data" and defendants have posited

rational explanations for the ordinance, the Court dismisses plaintiffs' equal protection claim (count 2). *Beach Commc'ns, Inc.*, 508 U.S. at 315 ("[A] legislative choice is not subject to courtroom fact-finding."); *see also Nat'l Paint & Coatings Ass'n*, 45 F.3d at 1129.

**D.    Commerce Clause**

The Commerce Clause implicitly prevents state and local governments from passing laws that discriminate against or excessively burden interstate commerce. U.S. Const. art. 1, § 8, cl. 3; *see also Clover Leaf Creamery Co.*, 449 U.S. at 471. Plaintiffs contend that the ordinance impermissibly burdens and discriminates against interstate commerce.

To prevail on a so-called "dormant" commerce clause claim, plaintiffs must, as a threshold matter, demonstrate that the law or regulation burdens interstate commerce. *See Alliant Energy Corp. v. Bie*, 330 F.3d 904, 911 (7th Cir.2003); *C & A Carbone, Inc. v. Town of Clarkstown*, 511 U.S. 383, 389 (1994). If a law or regulation burdens interstate commerce, a court must categorize the law's effects. *See Nat'l Paint & Coatings Ass'n*, 45 F.3d at 1131–32. Laws that expressly discriminate against interstate commerce are "virtually per se" invalid. *C & A Carbone, Inc.*, 511 U.S. at 392. Laws that are facially neutral but have a powerful disparate effect on interstate commerce are also considered discriminatory. *See Nat'l Paint & Coatings Ass'n*, 45 F.3d at 1131. By contrast, laws that are facially neutral but have only incidental or indirect effects on interstate commerce are analyzed under the *Pike* balancing test, and a law is upheld "unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits." *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142 (1970); *see also*

*Nat'l Paint & Coatings Ass'n*, 45 F.3d at 1134; *Gov't Suppliers Consolidating Servs., Inc.*

*v. Bayh*, 975 F.2d 1267, 1277 (7th Cir. 1992).

Plaintiffs suggest a number of ways that the ordinance burdens interstate commerce. First, they contend that the ordinance is facially discriminatory because it defines a "pound," which is a permissible supplier for pet stores, to include only those pounds that are licensed by the state of Illinois. Am. Compl. ¶ 74. A law that expressly discriminates against interstate commerce is "virtually per se" invalid. *C & A Carbone, Inc.*, 511 U.S. at 392. But this provision does not expressly distinguish between in-state and out-of-state pounds. Although "pound" is defined as "any facility licensed by the Illinois Department of Agriculture," the ordinance later lists the permissible sources for pet stores to include a "pound . . . operated by *any* subdivision of local, state or federal government." Cook County, Ill., Rev. Ordinances ch. 10, art. I, §§ 10-2, 10-13 (emphasis added). Pet stores can therefore obtain pets from *any* pound, whether it is operated by a government entity in Illinois or another state. This provision does not distinguish between pounds based on location, and there is no indication that the provision otherwise affects interstate commerce. Thus, the ordinance's definition of "pound" does not run afoul of the Commerce Clause.

Plaintiffs' other Commerce Clause claims fail because plaintiffs have not plausibly alleged that the ordinance burdens interstate commerce. *See Bie*, 330 F.3d at 911 ("If a party seeking to invalidate a statute cannot show any burden on interstate commerce, then the Dormant Commerce Clause is not implicated and the statute will not be invalidated."). Plaintiffs contend that the ordinance impermissibly burdens interstate commerce because "it eliminates nearly all breeders from which the Pet

Shops are permitted to purchase animals."  Am. Compl. ¶ 78.  Plaintiffs essentially

claim that they will be unable to meet customers' demands because there will not be

enough breeders that meet the ordinance's requirements.  They argue that their supply

of pure- and specialty-breed pets will dry up and that customers will start to purchase

more pets at unregulated in-state breeders, who are not bound by the breeder-size

restrictions.  *Id.* ¶ 69.  Even if the ordinance will result in these problems for pet stores,

these effects are not interstate in nature.  Plaintiffs suggest that business will shift from

Illinois pet stores to Illinois breeders.  But a law does not burden interstate commerce if

it shifts business from one in-state firm to another in-state firm.  The Commerce Clause

only prohibits actions that increase the proportion of in-state goods in the market.  *See*

*Exxon Corp. v. Governor of Maryland*, 437 U.S. 117, 126 n.16 (1978) (rejecting

discriminatory effect argument where the "statute has no impact on the relative

proportions of local and out-of-state goods sold in Maryland and, indeed, no

demonstrable effect whatsoever on the interstate flow of goods").  A law does not

burden interstate commerce if it "affect[s] commerce without any reallocation among

jurisdictions," in other words, if the law does not "give local firms any competitive

advantage over those located elsewhere."  *Nat'l Paint & Coatings Ass'n*, 45 F.3d at

1131.  Plaintiffs' allegation that the ordinance will shift business between in-state entities

does not constitute a Commerce Clause violation.

Plaintiffs also claim that the ordinance "burdens interstate commerce because

pet shop owners will have to find breeders that meet the [o]rdinance's criteria outside of

Illinois, which will force them to incur greater transportation costs more frequently."  Am.

Compl. ¶ 79.  They complain that this will be made even more difficult and expensive

because the ordinance prohibits the use of Class B breeders that transport animals. *Id.* Plaintiffs' claim is not actionable under the Commerce Clause. The dormant Commerce Clause prohibits protectionist activity by state and local governments. A regulation that shifts business to out-of-state firms at the expense of in-state firms is not the type of harm the Commerce Clause prohibits. *See New Energy Co. of Ind. v. Limbach*, 486 U.S. 269, 273 (1988) ("This 'negative' aspect of the Commerce Clause prohibits economic protectionism—that is, regulatory measures designed to benefit in-state economic interests by burdening out-of-state competitors."); *Baude v. Heath*, 538 F.3d 608, 615 (7th Cir. 2008) (upholding a provision in an Indiana law that "simply shifts sales from smaller wineries (in all states, including Indiana) to larger wineries (all of which are located outside Indiana)," because "the fact that all Indiana wineries are small does more to show that this law's disparate impact cuts against in-state product than to show that Indiana has fenced out wine from other jurisdictions").

Plaintiffs identify one way the ordinance could cause out-of-state firms to benefit at the expense of in-state firms. They argue that the ordinance "effectively prevents out-of-state breeders, such as those represented by the MPBA[,] from having physical access to market demand for pure- and specialty-breed animals in Cook County," whereas "[i]n-state local unlicensed breeders . . . retain physical access to that market by virtue of being located here." Am. Compl. ¶ 76. Their argument proceeds as follows: There are not enough breeders that meet the ordinance's requirements to supply the desired number of specialty pets to Cook County pet stores. As a result, Cook County residents who want pure-bred pets will have to look elsewhere. They will turn to breeders to buy specialty pets, because breeders' sales to consumers are not regulated

under the ordinance.  Because Cook County consumers want to see pets before purchasing and do not want to travel outside of Illinois to do so, consumers will be more likely to buy from in-state breeders as opposed to out-of-state breeders.  In-state breeders will therefore get more business, and out-of-state breeders (who otherwise would have sold to the pet stores but will not be able to if they do not meet the ordinance's requirements) will get less business.

The purported discriminatory effect is indirect and relies on numerous implausible assumptions about the market for pets.  The Court assumes, for purposes of the motion to dismiss, that the ordinance will prevent Cook County pet stores from supplying enough pure-bred pets to meet consumers' demands, although even this assumption is speculative.  To determine whether there is a disparate effect on interstate commerce, the Court must ask where consumers will buy pets if they cannot find the pets they want in Cook County pet stores.  *See Nat'l Paint & Coatings Ass'n*, 45 F.3d at 1132.  First, there is no suggestion that of the counties surrounding Cook County have a similar ordinance.  If the Cook County ordinance takes effect, the most likely outcome will be that Cook County consumers who would have purchased a pet at a Cook County pet store instead will travel to a pet store in one of the surrounding counties.  Alternatively, more people will get pets from not-for-profit or government entities.  But neither of these outcomes imposes a burden on interstate commerce, as business would simply shift between entities within Illinois.  *See Exxon Corp*, 437 U.S. at 126 n.16.

Even if the Court finds plausible plaintiffs' claim that consumers will be more likely to buy pets directly from breeders, it is not plausible that consumers will be more likely to buy from Illinois breeders.  The complaint contradicts this contention.  Currently,

two of the pet store plaintiffs obtain "100% of their puppies from out of state breeders," and the third obtains "98.71% of its animals from out of state." Am. Compl. ¶ 47. This is because "there is a very limited supply of breeder-provided animals in Illinois." *Id.* This fact suggests that there are not enough Illinois breeders to meet consumers' demands as it is, which makes it unlikely that Illinois breeders would sell more pets if the ordinance takes effect.

Additionally, plaintiffs assume that out-of-state breeders will not be able to restructure their businesses without significant expense. But out-of-state breeders could comply with the breeder-size and licensing requirements. Although plaintiffs have not indicated how difficult it is for a breeder to obtain a class A license, they admit that "[t]heoretically, a breeder with fewer than 5 dogs could ask the USDA to regulate them." *Id.* ¶ 42.

Finally, plaintiffs argue that consumers will be less likely to travel to an out-of-state breeder than an in-state breeder. But a Cook County resident can visit a breeder in Indiana or Wisconsin just as quickly (if not more quickly) as he can travel to many breeders in Illinois. Moreover, plaintiffs indicate that there is a large demand for pure- and specialty-bred dogs that will go unmet if the ordinance takes effect. They state that "the average selling price of a [specialty-breed] dog at a Pet Store is approximately $1,200[,] while the average price at a shelter is around $150." *Id.* ¶ 58; *see also id.* ¶ 77. If consumers are truly as discerning about their pure- and specialty-breed dogs as plaintiffs suggest, then wouldn't those consumers also be willing to travel significant distances (if Missouri can be considered a significant distance) to buy a particular breed from a breeder?

In order to find plaintiffs' claim of discriminatory effect plausible, the Court would have to accept that the ordinance will trigger this extended chain of events, which will indirectly result in in-state breeders benefiting at the expense of out-of-state breeders. The Court finds the alleged effect to be too indirect and speculative to "raise a reasonable expectation that discovery will reveal evidence" of a Commerce Clause violation. *Twombly*, 550 U.S. 544, 545 (2007).

Because plaintiffs have not plausibly alleged that the law discriminates against or burdens interstate commerce, rational-basis review applies. *See Nat'l Paint & Coatings Ass'n*, 45 F.3d at 1131–32. As the Court has indicated, Cook County has advanced plausible rationales for the ordinance's restrictions. Thus, the Court dismisses plaintiffs' Commerce Clause claim (count 1).

## E.    Contract Clause

The U.S. Constitution prohibits state and local governments from passing laws that impair the obligation of contracts. U.S. Const. art. I, § 10, cl. 1. The pet stores and their owners claim that the ordinance violates the Contract Clause because it impermissibly interferes with their building leases, franchise agreements, and contracts to purchase pets from particular breeders. Am. Compl. ¶ 114. Plaintiffs also argue that an Illinois law that requires pet stores to "exchange the dog or cat for another dog or cat of comparable value" if the animal develops certain health problems after the sale creates a warranty between consumers and pet stores. 225 ILCS 605/3.15(g). The pet stores claim they cannot honor these warranties if the ordinance takes effect, because their supply of comparable pets will be significantly limited. Am. Compl. ¶ 63.

Although the Contract Clause appears absolute in its prohibition, it "does not

deprive the States of their 'broad power to adopt general regulatory measures without being concerned that private contracts will be impaired, or even destroyed, as a result.'" *Exxon Corp. v. Eagerton*, 462 U.S. 176, 190 (1983) (quoting *United States Tr. Co. v. New Jersey*, 431 U.S. 1, 22 (1977)); *see also Chi. Bd. of Realtors, Inc. v. City of Chicago*, 819 F.2d 732, 735–36 (7th Cir. 1987).

Courts apply a "three-step inquiry to determine whether or not a law violates the contract clause." *Chi. Bd. of Realtors, Inc.*, 819 F.2d at 736. Courts ask (1) "whether the [o]rdinance in fact operates as a substantial impairment of existing contractual relationships;" (2) "whether the city has a significant and legitimate public purpose justifying the [o]rdinance;" and (3) "whether the effect of the [o]rdinance on contracts is reasonable and appropriate given the public purpose behind the [o]rdinance." *Id.* In this case, the ordinance will not make it impossible for the pet stores to meet their contractual obligations, as it does not impose a prohibition on any contracts or completely eliminate plaintiffs' businesses. Even assuming the ordinance substantially impairs existing contracts, as plaintiffs allege, Cook County has outlined legitimate purposes for the regulation, as the Court has previously noted. Courts are less inclined to strike down legislation that has an "incidental effect" on existing contracts when a state or local government does not "prescribe a rule limited in effect to contractual obligations or remedies, but instead impose[s] a generally applicable rule of conduct designed to advance 'a broad societal interest.'" *Exxon Corp.*, 462 U.S. 176 at 191–92 (quoting *Allied Structural Steel Co. v. Spannaus*, 438 U.S. 234, 249 (1978)). Moreover, "when the state or its agent is not a party to the contract impaired by the challenged law, the court's scrutiny is relaxed." *Chi. Bd. of Realtors, Inc.*, 819 F.2d at 737. In situations

like this one, the court must defer to the legislators' judgment and ask whether they "rationally could have believed [the ordinance] would lead to improved public health and welfare." *Id.*; *see also U.S. Tr. Co. of N.Y.*, 431 U.S. at 22–23 ("As is customary in reviewing economic and social regulation [ ] courts properly defer to legislative judgment as to the necessity and reasonableness of a particular measure."); *Keystone Bituminous Coal Ass'n v. DeBenedictis*, 480 U.S. 470, 506 (1987). The inquiry under the Contract Clause resembles rational basis review. Accordingly, plaintiffs' Contract Clause claim fails for the same reason their equal protection and Commerce Clause claims fail. Because defendants have presented legitimate public interests that support the ordinance, the Court dismisses plaintiffs' Contract Clause claim (count 5).

## F.    Vagueness

Plaintiffs also claim that the ordinance is void for vagueness. An ordinance "may operate in an unconstitutionally vague manner if it: 1) does not provide a person of ordinary intelligence a reasonable opportunity to know what is prohibited, or 2) fails to provide explicit standards to prevent arbitrary and discriminatory enforcement by those enforcing the statute." *United States v. Lim*, 444 F.3d 910, 915 (7th Cir. 2006). When a contested piece of legislation does not implicate First Amendment freedoms, as in this case, "the challenger must show that the law is vague as applied to the facts of the case at hand." *United States v. Brierton*, 165 F.3d 1133, 1139 (7th Cir. 1999). As applied to plaintiffs, the contested provisions offer enough guidance that a person of ordinary intelligence would know what is prohibited.

First, plaintiffs challenge the provision that exempts from regulation "those areas which are governed by an ordinance of another governmental entity (which by law may

not be superseded by this section)." Cook County, Ill., Rev. Ordinances ch. 10, art. I, § 10-13(e). Plaintiffs argue that this is vague because it is not clear whether "an ordinance of another governmental entity" refers to federal, state, or local law. Am. Compl. ¶ 105. It is clear, however, that "ordinance" in that provision refers to regulations passed by other local governments, namely municipalities within Cook County. *See* Black's Law Dictionary 1273 (10th ed. 2014) (defining "ordinance" as "a municipal regulation"). Moreover, it is clear that "an ordinance" refers to any conflicting ordinance as opposed to any ordinance at all, because the latter interpretation would render the Cook County ordinance meaningless.

Second, plaintiffs challenge the provision listing the government-run entities from which pet stores can obtain animals. Am. Compl. ¶ 105. Specifically, they contend that pet stores lack sufficient guidance because the permissible sources are not adequately defined. The meaning of each undefined term in that section is reasonably clear, however. First, the key requirement is that the sources listed in section 10-13(a)(1) must be "operated by any subdivision of local, state or federal government." Cook County, Ill., Rev. Ordinances ch. 10, art. I, § 10-13(a)(1). And the dictionary definitions of the ordinance's terms provide guidance as to their meaning. *See, e.g.*, *People v. Gutman*, 2011 IL 110338, ¶ 15, 959 N.E.2d 621, 625 (Ill. 2011) (consulting dictionary definitions to interpret statutory terms). A "humane society" is "a society for the prevention of cruelty to animals." *Merriam-Webster*, http://www.merriam-webster.com (last visited May 18, 2015). The other undefined terms likewise can be understood with reference to their dictionary definitions. *See id.* (defining "animal control" as "an office or department responsible for enforcing ordinances relating to the control,

impoundment, and disposition of animals" and defining "kennel" as "a shelter for a dog or cat").  An "animal care facility" and "training facility," though not defined in the dictionary or the ordinance, can be understood by reference to their common meaning—the former is a facility where animals are treated and the latter is a facility where animals are trained.  *See Perrin v. United States*, 444 U.S. 37, 42 (1979) ("A fundamental canon of statutory construction is that, unless otherwise defined, words will be interpreted as taking their ordinary, contemporary, common meaning."); *People v. McCoy*, 63 Ill. 2d 40, 45, 344 N.E.2d 436, 439 (1976).  Most importantly, all of the permissible sources listed in section 10-13(a)(1) are government-run entities.  Thus, the question posed in the complaint—whether the Amish community where Happiness Is Pets (one of the pet store plaintiffs) purchases many of its animals is a permissible source because it treats animals humanely—is easily answered.  Am. Compl. ¶ 105. Because the Amish community is not a government-run entity, it is not a permissible source unless the ordinance's breeder requirements are met.

Third, plaintiffs claim that the term "pet shop operator" is vague.  *Id.* ¶ 105.  That term is defined by reference to the Illinois Animal Welfare Act, Cook County, Ill., Rev. Ordinances ch. 10, art. I, § 10-2, which defines "pet shop operator" as "any person who sells, offers to sell, exchange, or offers for adoption with or without charge or donation dogs, cats, birds, fish, reptiles, or other animals customarily obtained as pets in this State."  225 ILCS 605/2.  According to plaintiffs, the ordinance is vague and confusing because entities such as "rescue organization[s]," which would normally be considered pet shop operators under the IAWA, are exempted from regulation under the ordinance. Cook County, Ill., Rev. Ordinances ch. 10, art. I, § 13-10(a)(2).  It is clear, however, that

those organizations that are exempted are not considered pet shop operators under the ordinance, even if the IAWA categorizes those entities differently.

Finally, plaintiffs claim that the penalty section of the ordinance is contradictory, because it allows criminal punishment for any violation of the chapter (i.e., the entire chapter of the Cook County Code of Ordinances that deals with "Animals") but also specifies that a violation of section 10-13 results in a fine of $500 for each violation. *Id.*, § 10-3(a). According to plaintiffs, it is unclear whether a pet store owner may be incarcerated for violating section 10-13 of the ordinance. Am. Compl. ¶ 105. The first part of the penalty provision, which allows a fine or imprisonment for "any person violating any provision of this chapter," refers to violations of all other parts of Chapter 10 (titled "Animals"). The ordinance's more specific provision relating to violations of section 10-13 governs violations of that particular section, as it expressly states that "any person violating or failing to comply with Sec. 10-13 of the chapter shall be subject to a fine of $500.00 for each violation." Cook County, Ill., Rev. Ordinances ch. 10, art. I, § 10-3(a). Specific language in a piece of legislation trumps more general language. *See Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 384 (1992) ("[I]t is a commonplace of statutory construction that the specific governs the general."). It is clear that a $500 fine per violation is the mandatory and exclusive penalty for section 10-13 violations.

In sum, none of the provisions identified by the plaintiffs is vague, because none would confuse a person of ordinary intelligence. Moreover, plaintiffs' vagueness challenge must be dismissed because state courts have not had the opportunity to consider the ordinance. The Seventh Circuit has refused to hold an ordinance

unconstitutional as vague when state courts and agencies have not had the opportunity to apply a narrowing construction. *See, e.g.*, *Gresham v. Peterson*, 225 F.3d 899, 908 (7th Cir. 2000) ("[T]he rule that federal courts should defer to state court interpretations of state laws, also discourages federal courts from enjoining statutes that could be easily narrowed by a state court to avoid constitutional problems.").  Here, no state court or agency has analyzed the ordinance.  Thus, it would be inappropriate for the Court to strike down the legislation on vagueness grounds.  *Id.* (affirming dismissal of complaint and denial of a preliminary injunction).  The Court therefore dismisses plaintiffs' claim that the ordinance is void for vagueness (count 4).

**G.    Injunctive relief**

The complaint includes a claim requesting permanent injunctive relief.  Am. Compl. ¶¶ 126–30.  The Court agrees with defendants that this is not appropriately considered as a separate claim for relief, because an injunction is a remedy rather than a cause of action.  *See Noah v. Enesco Corp.*, 911 F. Supp. 305, 307 (N.D. Ill. 1995). Accordingly, the Court dismisses the claim for injunctive relief (count 6).

## Conclusion

For the foregoing reasons, the Court grants defendants' motion to dismiss [dkt. no. 25].  Although it is highly unlikely that plaintiffs can cure the complaint's defects by amendment, the Court will give them a chance to try.  Unless plaintiffs file a proposed amended complaint by no later than June 11, 2015 that states a viable federal claim, the Court will enter judgment in favor of defendants.  The case is set for a status

hearing on June 16, 2015 at 9:30 a.m.

_____
MATTHEW F. KENNELLY
United States District Judge

Date: May 21, 2015