**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| **MISSOURI PET BREEDERS ASSOCIATION,** )<br>**STARFISH VENTURES, INC. d/b/a** )<br>**Petland of Hoffman Estates, DAN STAR,** )<br>**and JANET STAR; HAPPINESS IS PETS OF** )<br>**ARLINGTON HEIGHTS, INC.,** )<br>**RONALD BERNING; J & J MANAGEMENT,** )<br>**INC. d/b/a Petland of Chicago Ridge,** )<br>**and JAMES MACIEJEWSKI,** )<br>)<br>      **Plaintiffs,** )<br>)<br>    **vs.** )<br>)<br>**COUNTY OF COOK,** )<br>**TONI PRECKWINKLE,** )<br>**and DONNA ALEXANDER,** )<br>)<br>      **Defendants.** ) | **No. 14 C 6930** |

## MEMORANDUM OPINION AND ORDER

MATTHEW F. KENNELLY, District Judge:

Plaintiffs, the Missouri Pet Breeders Association (MPBA) and three Cook County pet shops and their owners, have sued Cook County, the President of the Cook County Board of Commissioners, and the Director of Cook County Animal & Rabies, alleging that a Cook County ordinance violates the United States and Illinois Constitutions. Defendants have moved to dismiss the second amended complaint pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). The Court grants defendants' motion to dismiss for the reasons stated below.

### Background

For purposes of the motion to dismiss, the Court accepts as true the facts alleged

in plaintiffs' complaint.  *See Fortres Grand Corp. v. Warner Bros. Entm't Inc.*, 763 F.3d 696, 700 (7th Cir. 2014).  The Court set forth a detailed description of the allegations in its May 21, 2015 decision granting the defendants' motion to dismiss the first amended complaint.  *See Mo. Pet Breeders Ass'n v. Cty. of Cook*, No. 14 C 6930, 2015 WL 2448332, at *1–2 (N.D. Ill. May 21, 2015).  The Court will provide a general overview and will highlight relevant amendments in its discussion of the individual claims.

The Cook County Board of Commissioners passed the Cook County Companion Animal and Consumer Protection Ordinance (Ordinance No. 14-2408) in April 2014. The ordinance regulates the sales of dogs, cats, and rabbits by pet stores located in Cook County, Illinois.  Under the ordinance, a "pet shop operator" may only sell animals obtained from a breeder that (among other requirements) holds a USDA class "A" license and "owns or possesses no more than five (5) female dogs, cats, or rabbits capable of reproduction in any twelve (12) month period."  Cook County, Ill., Rev. Ordinances ch. 10, art. I, § 10-13(a)(3) (2014).[1]  The ordinance exempts local not-for-profit and government-run entities.  *Id.* §§ 10-13(a)(1), 10-13(b).  Accordingly, those entities can sell pets directly to consumers and pet stores without regulation.

Plaintiffs in this case are the Missouri Pet Breeders Association (MPBA), a professional organization that advocates for the interests of its member pet breeders, and three Cook County pet shops and their owners.  The pet stores claim that they will go out of business if the ordinance takes effect, because there are not enough breeders that meet the ordinance's requirements to supply Cook County pet stores with the

---

[1] The Court may take judicial notice of the ordinance without converting defendants' motion to dismiss into a motion for summary judgment.  *See Newcomb v. Brennan*, 558 F.2d 825, 829 (7th Cir. 1977).

desired number of specialty pets. Plaintiffs also claim that the ordinance will impact out-of-state breeders, including the Missouri breeders who MPBA represents. Even though breeders are not directly regulated, the ordinance would effectively ban local pet shops from selling pets imported from many out-of-state breeders. Plaintiffs also contend that breeders outside of Illinois will lose business in the following way: the ordinance does not regulate breeders' direct sales to consumers, so breeders without licenses can sell to Cook County residents without restriction. Thus, Cook County residents who want specialty breeds and cannot find them at Cook County pet stores (because their supply will be essentially wiped out) will instead purchase dogs directly from breeders. According to plaintiffs, Cook County consumers will be more likely to buy from in-state breeders, as few will be willing to travel to another state to purchase an animal. Thus, out-of-state breeders will lose business to Illinois breeders.

In their second amended complaint, plaintiffs claim that the ordinance is invalid under the U.S. Constitution because it violates the Commerce Clause (counts 1, 2, 4, 5), the Foreign Commerce Clause (count 3), the Equal Protection Clause (count 6), and the Contract Clause (count 9). (Only the pet shop plaintiffs allege violations of the Contract Clause and the Foreign Commerce Clause.) Plaintiffs also contend that the ordinance is impermissibly vague (count 8), is preempted by federal law (count 10), and is preempted by Illinois law and violates Article VII of the Illinois Constitution (count 7). They ask the Court to enter an order invalidating the ordinance and enjoining the County from enforcing it.

## Discussion

When considering a motion to dismiss under Rule 12(b)(6), the Court accepts a

plaintiff's allegations as true and draws reasonable inferences in its favor. *Parish v. City of Elkhart*, 614 F.3d 677, 679 (7th Cir. 2010). In order to state a viable claim, a plaintiff must provide "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is plausible on its face if "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

Plaintiffs' Equal Protection Clause and Contract Clause claims, which the Court dismissed in its order dated May 21, 2015, have not changed. Accordingly, the Court reaffirms its dismissal of those claims. *See Mo. Pet Breeders Ass'n*, 2015 WL 2448332, at *6–7, *10–11.

## A.    Foreign Commerce Clause

The Court previously held that the pet store plaintiffs did not have standing to raise a Foreign Commerce Clause claim, "because none of them have alleged that they actually purchase animals from foreign breeders." *Id*. at *4. Plaintiffs amended their complaint to allege that "Happiness [Is Pets] has in fact purchased dogs from Europe in the past." Second Am. Compl. ¶ 114. Although the pet stores do not buy foreign pets now, they say that if the ordinance becomes effective, they will not be able to obtain the number of specialty dogs they need from American breeders because not enough American breeders meet the ordinance's requirements. Thus, they will have to try to "purchase animals from reputable breeders outside the United States, such as from Canada or Europe." *Id.* But the pet stores will be prevented from doing so because foreign pet breeders cannot obtain the required USDA licenses. *Id.* ¶ 115.

4

The pet stores do not have standing to raise this claim. To satisfy the injury-in-fact requirement in a pre-enforcement action, the plaintiff must show "an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute." *Am. Civil Liberties Union of Ill. v. Alvarez*, 679 F.3d 583, 590–91 (7th Cir. 2012). The pet stores do not actually intend to purchase pets from foreign breeders. Rather, they will attempt to do so only in the event that they cannot obtain enough pets from American breeders due to the ordinance. Plaintiffs have failed to allege that they are in immediate danger of sustaining direct injury or that foreign interests will be affected if the ordinance becomes effective, as is necessary to show standing. *See Massachusetts v. Mellon*, 262 U.S. 447, 488 (1923).

This is perhaps better understood as a ripeness issue. Although the parties have not briefed the issue, "the question of ripeness may be considered on a court's own motion." *Nat'l Park Hosp. Ass'n v. Dep't of Interior*, 538 U.S. 803, 808 (2003). "As compared to standing, ripeness assumes that an asserted injury is sufficient to support standing, but asks whether the injury is too contingent or remote to support present adjudication." 13B Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 3532.1 (3d ed. 1998). The Foreign Commerce Clause claim is not ripe for review, as it involves "contingent future events that may not occur as anticipated, or indeed may not occur at all." *Thomas v. Union Carbide Agric. Prods. Co.*, 473 U.S. 568, 580 (1985) (internal quotation marks omitted). For a claim to be ripe, "[o]ne does not have to await the consummation of threatened injury to obtain preventive relief. If the injury is certainly impending, that is enough." *Id.* at 581. But the alleged injury is not "certainly impending" in this case. The pet stores' claim that they will be forced to try to

buy foreign animals is speculative at best. They have not alleged facts that make plausible their contention that they will not be able to meet the demand for specialty pets within the United States. Nor have plaintiffs identified what foreign interests might be threatened under the Ordinance. They say nothing about the market for foreign-sourced animals in the United States. From what is alleged in the complaint, it appears that pet stores only rarely obtain animals from abroad. The impact on foreign commerce, if any, is thus speculative and indirect.

In sum, because the possibility of injury to foreign interests is too remote and indirect, the pet stores' Foreign Commerce Clause claim is not ripe.

**B.      Vagueness**

Plaintiffs allege that multiple provisions in the ordinance are unconstitutionally vague. Apart from the provision the Court discusses below, plaintiffs' vagueness arguments remain unchanged from their previous complaint. The Court has already rejected those arguments and will not address them again. *See Mo. Pet Breeders Ass'n*, 2015 WL 2448332, at *11–12.

Plaintiffs have amended their claim that the applicability section is void for vagueness. Section 10-13(e) provides that "[t]his section shall apply to all areas within Cook County, Illinois, except those areas which are governed by an ordinance of another governmental entity (which by law may not be superseded by this section)." Cook County, Ill., Rev. Ordinances ch. 10, art. I, § 10-13(e). The Court previously concluded that the provision was not vague, because it "refers to any conflicting ordinance" passed by an incorporated municipality in Cook County. *Mo. Pet Breeders Ass'n*, 2015 WL 2448332, at *11.

Plaintiffs now allege that "each of the Pet Shops is located within a city [or] village that has its own local ordinances which regulates them. In other words, they are 'governed by an ordinance of another governmental entity'" as defined by the ordinance. Second Am. Compl. ¶ 150. Because of this, they say, "[t]he Ordinance is not drafted so as to provide fair guidance for parties to understand whether and how the Ordinance applies to them, nor does it provide sufficient precision such that County authorities are disabled from enforcing it in an arbitrary and discriminatory way." *Id.* ¶ 152. Contrary to plaintiffs' argument, the ordinance was intended to apply in all areas of Cook County unless an incorporated municipality passes a conflicting ordinance. The applicability provision complies with the Illinois Constitution, which states: "If a home rule county ordinance conflicts with an ordinance of a municipality, the municipal ordinance shall prevail within its jurisdiction." Ill. Const. art. 7, § 6(c). In other words, incorporated municipalities' laws govern in the event of a conflict.

The Cook County ordinance was drafted to allow an incorporated municipality to opt out by passing its own conflicting ordinance governing pet shop sales. As Commissioner John Fritchey explained during the April 9, 2014 meeting, the Board chose to allow "home rule communities to opt out." *See* Cook Cty. Bd. of Comm'rs Meeting (Apr. 9, 2014), http://cook-county.granicus.com/MediaPlayer.php?view_id=3&clip_id=797 at 0:49:03–13. Commissioner Elizabeth Gorman also understood this to be the meaning of the applicability provision, when she asked one individual: "Are you in a community where if this [ordinance] were to pass—because there's an opt-out provision—that you'd go to the municipality board and . . . have the community exempt under home rule?" *Id.* at

1:37:27–39.

Each of the pet store plaintiffs is located in an incorporated municipality in Cook County.  Second Am. Compl. ¶ 147.  Plaintiffs have attached the relevant ordinances from those three municipalities to their complaint.  The Village of Chicago Ridge has opted not to follow Cook County's regulatory scheme.  Chicago Ridge passed an ordinance stating that the Cook County ordinance is applicable "unless the Village governs the sale of dogs and cats by its own ordinance."  *Id.*, Ex. A at 1.  The preamble states that "the Village Board deems that said amendment by the County inadequately addresses the problems associated with CBEs[, commercial breeding establishments,] and provides for weak or unenforceable provisions."  *Id.* at 2.  It also states that the Village's leaders "believe it to be in the best interests of the Village" to regulate the sale of commercially bred dogs and cats in pet shops.  *Id.*  This renders moot the claims of Petland of Chicago Ridge and its owner James Maciejewski, as the store is not actually regulated under the Cook County ordinance.  *See U.S. Parole Comm'n v. Geraghty*, 445 U.S. 388, 396–97 (1980).

The other two municipalities, Hoffman Estates and Arlington Heights, have ordinances that relate to animal control, although the provisions provided by the plaintiffs do not appear to conflict with Cook County's ordinance.  Second Am. Compl., Ex B; *Id.*, Ex. C.  It thus does not appear that either municipality has chosen to opt out of Cook County's regulations.  But even if it were unclear whether a particular municipality has opted out, that would not be the result of any ambiguity in the Cook County ordinance.  In sum, the ordinance is not void for vagueness.

**C.  Home rule powers and state preemption**

Plaintiffs argue that the Court improperly dismissed their claim that the ordinance violates the County's home rule powers under the Illinois Constitution and is preempted under Illinois law.  *See Mo. Pet Breeders Ass'n*, 2015 WL 2448332, at *4–5.  They have amended their complaint to state that the "elimination of animal mills is a state-wide and national problem and therefore not appropriate for Cook County to regulate."  Second Am. Compl. ¶ 143.  They contend that the question of which governmental unit has the most vital interest in regulating animal welfare requires factual development to answer.

Even if Illinois traditionally regulates animal control and this is not a purely local issue, as plaintiffs suggest, the Illinois Constitution grants counties the power to "exercise and perform concurrently with the State any power or function of a home rule unit to the extent that the General Assembly by law does not specifically limit the concurrent exercise or specifically declare the State's exercise to be exclusive."  Ill. Const. art. 7, § 6(i).  There is no state law that expressly limits local governments' authority in this area.  Thus, the ordinance does not violate the home rule provisions of the Illinois Constitution and is not preempted under Illinois law.

**D.  Federal preemption**

The Court previously dismissed plaintiffs' federal preemption claim in light of the Seventh Circuit's decision in *DeHart v. Town of Austin*, 39 F.3d 718 (7th Cir. 1994).  *Mo. Pet Breeders Ass'n*, 2015 WL 2448332, at *5–6.  Plaintiffs have not meaningfully changed their allegations with respect to this claim.  They argue that "Cook County does not have the power to selectively dictate which USDA-approved breeders can sell locally."  Pls.' Resp. to Defs.' Mot. to Dismiss at 13.  They claim that Cook County

cannot "substitute its judgment for that of Congress concerning the minimum standards necessary to ensure 'humane care and treatment' of animals in interstate commerce by banning 99% of such products." *Id.* at 14. But Congress expressly contemplated that local governments might set more rigorous standards for animal welfare than the federal government. The Animal Welfare Act (AWA) states that the statute "shall not prohibit any State (or a political subdivision of such State) from promulgating standards in addition to those standards promulgated by the Secretary." 7 U.S.C. § 2143(a)(8). Based on this provision, "it is clear that the Animal Welfare Act does not evince an intent to preempt state or local regulation of animal or public welfare." *DeHart*, 39 F.3d at 722.

Plaintiffs appear to concede that this is not a case of express or implied preemption; rather, they allege that the ordinance conflicts with the federal regulatory scheme. According to the plaintiffs, a local ordinance that essentially bans interstate movement of animals conflicts with the provision of the AWA that states that the "regulation of animals and activities as provided in this chapter is necessary to prevent and eliminate burdens upon such commerce and to effectively regulate such commerce." 7 U.S.C. § 2131. The asserted provision does not limit the power of state or local governments to regulate in this area, as long as they do not enact legislation that violates the Commerce Clause. As the Court previously concluded, plaintiffs cannot maintain a federal preemption claim.

E.    **Commerce Clause**

The Commerce Clause implicitly prevents state and local governments from passing laws that discriminate against or excessively burden interstate commerce. U.S. Const. art. 1, § 8, cl. 3; *see also Minnesota v. Clover Leaf Creamery Co.*, 449 U.S. 456,

471 (1981).  Plaintiffs have alleged four claims under the so-called "dormant" Commerce Clause.  In count 5, plaintiffs allege that the ordinance is discriminatory on its face because it defines a "pound," which is a permissible supplier for pet stores, to include only those pounds that are licensed by the state of Illinois.  Cook County, Ill., Rev. Ordinances ch. 10, art. I, §§ 10–2, 10–13 (defining "pound" as "any facility licensed by the Illinois Department of Agriculture," but also listing the permissible sources for pet stores to include a "pound . . . operated by any subdivision of local, state or federal government").  Plaintiffs have not amended this claim, which the Court has already dismissed.  *See Mo. Pet Breeders Ass'n*, 2015 WL 2448332, at *8.

### 1.    Discriminatory purpose and effect

In count 1, plaintiffs allege that the ordinance is "explicitly discriminatory and has a discriminatory purpose and effect by banning local pet shops from selling animals obtained from nearly any breeder located outside Cook County."  Second Am. Compl. ¶ 101.  They contend that the County "was aware when it enacted the Ordinance that pet stores obtained their inventory from out-of-state breeders.  By design and practical effect, the Ordinance prevents out-of-state breeders such as those represented by the MPBA from having physical access to local market demand for pure and specialty breed animals in Cook County."  *Id.*

Laws that expressly discriminate against interstate commerce or have a powerful disparate effect on interstate commerce are invalid.  *See C & A Carbone, Inc. v. Town of Clarkstown*, 511 U.S. 383, 392 (1994); *Nat'l Paint & Coatings Ass'n v. City of Chicago*, 45 F.3d 1124, 1131 (7th Cir. 1995).  Plaintiffs cite statements made by a Cook County Commissioner during the April 9, 2014 Board meeting that purport to show a

discriminatory purpose. Those videos do show that the law's sponsor intended to impact sales by out-of-state breeders to Cook County pet stores.[2] But viewing the video in context and considering it together with the preamble to the ordinance, it is clear that the discussion of out-of-state breeders centered on how the Board could regulate out-of-state *and* in-state breeders in the same manner and did not involve targeting out-of-state breeders.

The purpose of the ordinance was to prevent the sale of pets from inhumane large breeders in Cook County. Pmbl. to Cook County, Ill. Ordinance Amend. No. 14–2408 (Apr. 9, 2014). The board members wanted to regulate all pets sold in Cook County, regardless of origin. Commissioner Fritchey said during the meeting that "[t]he majority of the dogs that are sold at pet shops here are coming from out-of-state breeders that we have zero ability to [directly] regulate." *See* Cook Cty. Bd. of Comm'rs Meeting (Apr. 9, 2014), at 0:46:27–33. He continued, "[t]he only thing that we can do to impact breeders from out-of-state is to try to affect regulations that would keep people from selling dogs from breeders from out-of-state here." *Id.* at 0:47:58–48:09. Far from showing discriminatory intent, this is an uncontroversial statement concerning how a municipality may constitutionally regulate extraterritorial conduct.

Fritchey went on to say that "[i]f somebody was intent on getting a dog from an

_____

[2] The Court may rely on the video footage in ruling on the motion to dismiss, because "a court may consider, in addition to the allegations set forth in the complaint itself, documents that are attached to the complaint, documents that are central to the complaint and are referred to in it, and information that is properly subject to judicial notice." *Williamson v. Curran*, 714 F.3d 432, 436 (7th Cir. 2013). Here, plaintiffs have cited the video and have "relied on [its] contents as support for [their] claims." *Id.*; *see also Bogie v. Rosenberg*, 705 F.3d 603, 608–09 (7th Cir. 2013) (affirming dismissal, where "the video recording of the documentary was incorporated in Bogie's complaint, and the district court relied on its viewing of the video to decide the case").

out-of-state breeder . . . nothing would prohibit them in this from going right across the border." *Id.* at 0:48:10–18. In other words, there was no intention to ban the purchase of animals from out-of-state breeders. Fritchey noted that "people are not going to go travel to a breeder that has 150 dogs on site, etcetera. They're going to seek out a smaller breeder. And we have a lot of quality breeders . . . in Illinois." *Id.* at 0:48:18–35.

This statement, when understood in context, does not show any intent to give preferential treatment to in-state breeders. Rather, the statement explains the ordinance's exception for purchases made directly from a breeder. Those purchases were not considered problematic, because consumers are not likely to buy directly from a puppy mill, or "a breeder that has 150 dogs on site." (The Court recognizes that not all large breeders are inhumane, but it is clear from the video that Fritchey was referring to so-called puppy mills when he described these large breeders. *See also id.* at 0:50:54–51:07 (stating that the goal was "to cut off the demand for those dogs and cats here," referring to animals bred at large, inhumane breeders).) Although Fritchey observed that there are "quality breeders . . . in Illinois," this was a recognition that the ordinance will not deprive consumers of access to pure-bred pets, as direct purchases from breeders are not regulated. Pmbl. to Cook County, Ill. Ordinance Amend. No. 14–2408 (Apr. 9, 2014) ("[T]his Ordinance . . . will not affect a consumer's ability to obtain a dog or cat of his or her choice directly from a breeder.").

The Board only regulated purchases at pet stores, based on the understanding that some breeders that sell to pet stores "are not humane and are not representative of where people think that these dogs and cats are coming from." Cook Cty. Bd. of Comm'rs Meeting (Apr. 9, 2014), at 0:50:46–53. In short, the Board was concerned with

sales to pet stores, irrespective of the geographic origin of the pets. The Board was not concerned with direct sales by breeders, also irrespective of the origin of the pets. The video, when watched in its entirety, contradicts plaintiffs' claim that the ordinance was motivated by a discriminatory or protectionist purpose. *See Bogie v. Rosenberg*, 705 F.3d 603, 609 (7th Cir. 2013) ("When an exhibit incontrovertibly contradicts the allegations in the complaint, the exhibit ordinarily controls, even when considering a motion to dismiss.").

Additionally, this case does not involve discriminatory effect. The ordinance does not distinguish goods or services on the basis of origin and does not directly impact interstate commerce. *Compare Wyoming v. Oklahoma*, 502 U.S. 437, 455 (1992); *City of Philadelphia v. New Jersey*, 437 U.S. 617, 624 (1978), *with Clover Leaf Creamery Co.*, 449 U.S. at 471–72. As the Court discusses in the sections that follow, the ordinance is facially neutral, and any disparate impact on out-of-state breeders is indirect and incidental. *See Philadelphia*, 437 U.S. at 624 ("The crucial inquiry . . . must be directed to determining whether [the law] is basically a protectionist measure, or whether it can fairly be viewed as a law directed to legitimate local concerns, with effects upon interstate commerce that are only incidental."). Accordingly, the Court dismisses count 1, plaintiffs' claim alleging intentional discrimination and discriminatory effect.

### 2. Extraterritorial regulation

In count 4, plaintiffs allege that the ordinance impermissibly regulates extraterritorial conduct. They say that "[a] law that by design attempts to influence the domestic policies of other States and the federal government by erecting barriers to

interstate commerce is per se invalid."  Second Am. Compl. ¶ 120.  The decisions

finding the regulation of extraterritorial conduct per se invalid all involve the direct

regulation of activity that takes place wholly outside the jurisdiction.  *See Healy v. Beer*

*Inst., Inc.*, 491 U.S. 324, 336 (1989); *Nat'l Solid Wastes Mgmt. Ass'n v. Meyer*, 63 F.3d

652, 658 (7th Cir. 1995).  On the other hand, when a local government regulates local

transactions in a manner that has indirect effects outside of the state, the balancing test

under *Pike v. Bruce Church, Inc.*, 397 U.S. 137 (1970), applies.  *See Alliant Energy*

*Corp. v. Bie*, 336 F.3d 545, 547 (7th Cir. 2003) ("[T]he corollary to the principle that

direct or facial regulation of wholly extraterritorial transactions is per se invalid under the

two-tiered approach is the principle that incidental or indirect effects on extraterritorial

transactions are subject to the *Pike* balancing test.").

        This case does not involve direct regulation of extraterritorial activity; the

ordinance only regulates Cook County pet stores.  Plaintiffs allege that the regulation

indirectly impacts interstate commerce.  Because this is not a case involving direct

extraterritorial regulation, the Court must look to the undue burden cases to determine if

plaintiffs have plausibly alleged a Commerce Clause violation.

### 3.      Undue burden

        In count 2, plaintiffs allege that the ordinance unduly burdens interstate

commerce.  In the order dismissing the amended complaint, the Court ruled that

plaintiffs had not plausibly alleged an effect on interstate commerce.  *Mo. Pet Breeders*

*Ass'n*, 2015 WL 2448332, at *8–10.  Although plaintiffs have added details to their

complaint in an attempt to remedy this deficiency, the Court nonetheless finds

implausible the claim that the ordinance will affect interstate commerce.

Plaintiffs allege that Cook County pet shops currently buy most of their pets from out-of-state breeders that will not be able to comply with the ordinance's requirements. Second Am. Compl. ¶ 34. Thus, pet stores will not be able to satisfy the demand for pure-bred pets. Consumers who would have purchased an animal that came from a pet shop instead will have to purchase from a breeder, plaintiffs say. But the Court finds implausible the assumption that consumers will more often turn to local breeders if the ordinance takes effect. Although plaintiffs have plausibly alleged that consumers will not be able to get all the pets they want from government or not-for-profit entities, the most likely outcome will be that Cook County consumers who would have purchased a pure-bred pet at a Cook County pet store will travel to pet stores in one of the surrounding counties. Alternatively, they will go to pet stores in a municipality within Cook County that has opted out of the regulatory scheme. For instance, Chicago Ridge has opted out of the Cook County ordinance in favor of a disclosure-based regime. *Id.*, Ex A. If sales simply shift between pet stores within Illinois, there is no effect on interstate commerce. *See Exxon Corp. v. Governor of Maryland*, 437 U.S. 117, 126, 126 n.16 (1978).

Plaintiffs say that the Court must assume that other Illinois jurisdictions will adopt similar legislation—in other words, that consumers will not be able to buy their pure-bred pets from a pet shop in a surrounding county or municipality. They point out that "[t]he City of Chicago has passed a similar ordinance . . . . [and o]ther major local governmental entities such as the City of Naperville, Joliet, and other jurisdictions are considering enacting similar legislation." Second Am. Compl. ¶ 64. The Supreme Court has said, in analyzing a law that regulated wholly extraterritorial activity, that

> the practical effect of the statute must be evaluated not only by considering the consequences of the statute itself, but also by considering how the challenged statute may interact with the legitimate regulatory regimes of other States and what effect would arise if not one, but many or every, State adopted similar legislation.

*Healy*, 491 U.S. at 336. But the Court in *Healy* articulated this as a general principle governing "the extraterritorial effects of state economic regulation." *Id.* The Court was concerned with "inconsistent legislation arising from the projection of one state regulatory regime into the jurisdiction of another State." *Id.* at 337. To bring this line of cases into play, plaintiffs must allege that the challenged law is "inconsistent with the legitimate regulatory regimes of other states . . . or that any sort of interstate regulatory gridlock would occur if many or every state adopted similar legislation." *Freedom Holdings, Inc. v. Spitzer*, 357 F.3d 205, 221 (2d Cir. 2004); *see also Nat'l Elec. Mfrs. Ass'n v. Sorrell*, 272 F.3d 104, 112 (2d Cir. 2001) ("It is not enough to point to a risk of conflicting regulatory regimes in multiple states; there must be an actual conflict between the challenged regulation and those in place in other states."). Plaintiffs have not alleged that gridlock would result if most jurisdictions passed a similar law to Cook County's. If local governments in every state passed the same law more people might buy pets from nearby breeders than from pet stores, but every state's breeders would be impacted in a similar manner, and there would be no Commerce Clause concern.

"To determine whether there is a disparate effect on interstate commerce, [ ] we need to know what consumers will replace" the good with once it is regulated. *Nat'l Paint & Coatings Ass'n*, 45 F.3d at 1132. As the Court has said, if Cook County pet stores run short of animals, consumers likely will buy their pets from nearby pet stores that are not subject to the Cook County ordinance, such as Petland of Chicago Ridge.

Based on this information, it is not reasonable to infer that the law discriminates against or burdens interstate commerce.

Even if the Court were to assume that in-state pets will make up a larger share of the market and that out-of-state breeders therefore will be harmed if the ordinance takes effect, *Exxon Corp.*, 437 U.S. at 126 n.16, a reasonable person would think that the net benefits outweigh any harm caused by the ordinance based on the facts alleged in the complaint. In this case, the alleged effect is indirect and the statute is facially neutral, so the *Pike* balancing test applies: "Where the statute regulates even-handedly to effectuate a legitimate local public interest, and its effects on interstate commerce are only incidental, it will be upheld unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits." *Pike*, 397 U.S. at 142; *see also Clover Leaf Creamery Co.*, 449 U.S. at 471–72 (applying *Pike* because "Minnesota's statute does not effect simple protectionism, but regulates evenhandedly by prohibiting all milk retailers from selling their products in plastic, nonreturnable milk containers, without regard to whether the milk, the containers, or the sellers are from outside the State." (internal quotation marks omitted)). *Pike* applies because "laws with mild disparate effects and potential neutral justifications are analyzed under" that test. *Nat'l Paint & Coatings Ass'n*, 45 F.3d at 1131; *see also Baude v. Heath*, 538 F.3d 608, 611 (7th Cir. 2008) (holding that *Pike* applies where a state law applied in the same manner "to every winery, no matter where it is located," despite the challengers' contention that "the rules impose higher costs on interstate commerce as a practical matter").

When faced with a neutral law with indirect interstate effects, the question is whether "reasonable persons who held all states' interests in equal regard could think

that net benefits remained." *Nat'l Paint & Coatings Ass'n*, 45 F.3d at 1131. "Only if the burden on interstate commerce clearly outweighs the State's legitimate purposes does such a regulation violate the Commerce Clause.*"* *Clover Leaf Creamery Co.*, 449 U.S. at 474. The Court recognizes that *Pike* balancing is generally a fact-dependent inquiry. *See Wiesmueller v. Kosobucki*, 571 F.3d 699, 703 (7th Cir. 2009); *Baude*, 538 F.3d at 612; *Nat'l Paint & Coatings Ass'n*, 45 F.3d at 1130. Nonetheless, even accepting the facts alleged in the complaint as true—namely that the ordinance will harm out-of-state breeders at the benefit of in-state breeders—a reasonable person would think that the net benefits of the ordinance outweighed the harms. Based on the video cited in plaintiffs' complaint, the Cook County Board of Commissioners opted not to regulate direct sales by breeders based on the logical understanding that a consumer is not likely to buy an animal from an inhumane animal mill when he or she purchases directly from a breeder. *See* Cook Cty. Bd. of Comm'rs Meeting (Apr. 9, 2014), at 0:48:18–35; Pmbl. to Cook County, Ill. Ordinance Amend. No. 14–2408 (Apr. 9, 2014). The Board's primary concern was with pet stores' sales, because a consumer is less likely to know an animal's origin when he or she does not purchase it directly from the breeder. Thus, there is a higher likelihood that an animal purchased from a pet store was raised in inhumane conditions. Plaintiffs have not offered any factual allegations that would contradict this assumption.

The Cook County ordinance resembles the Indiana law considered in *Baude v. Heath*, 538 F.3d 608 (7th Cir. 2008). Indiana required consumers who wanted to receive direct shipments of wine to first visit the winery in person and supply proof of name, age, and address. *Id.* at 612. The plaintiffs alleged that out-of-state wineries

were adversely affected by this requirement. The court concluded that the burden identified—the additional costs associated with signing up for wine shipments in states like California—was likely minimal given that it is easier to sign up for multiple wineries in a day in California wine country compared to Indiana where the wineries are more spread out. Moreover, this burden was justified based on the state's legitimate interest in keeping alcohol out of minors' hands. *Id.* at 612–15. Though the law in *Baude* had already taken effect, the court observed that it was difficult to quantify its burdens and benefits. *Id.* at 614–15. The court nonetheless concluded that where "both the marginal cost and the marginal benefit of Indiana's face-to-face system may be modest[, t]hat is not enough to declare a law unconstitutional—not when the effect on interstate commerce is negligible." *Id.* at 615.

The ordinance is less burdensome than the Indiana law, because it does not impose an affirmative face-to-face requirement. People will be able to purchase pets from any breeder, whether in person or not. Plaintiffs contend that interstate commerce will be indirectly affected because people prefer to buy their pets in person. The purported effect on out-of-state interests is thus much more indirect and speculative than the law that was upheld in *Baude.* Even assuming that some in-state breeders will benefit at the expense of out-of-state breeders, the shift is likely to be minimal. Some proportion of consumers will choose to buy pets from out-of-state breeders, government or not-for-profit entities, or pet stores that successfully modify their business model to source from small, licensed breeders.[3] On the other side of the ledger, the law's stated

---

[3] Plaintiffs allege that even if out-of-state breeders "could somehow meet[ ] the Pet Shops['] supply . . . the elimination of Class B breeders (those that transport animals) as an available source makes it so that they could not be transported easily in interstate

benefits are significant.  The ordinance is designed to prevent the sale of animals sourced from large, inhumane breeders, which is a legitimate government interest.

Even if the ordinance sweeps too broadly, *Pike* balancing only requires the Court to consider whether the net burdens clearly outweigh the net benefits.  "A nondiscriminatory regulation serving substantial state purposes is not invalid simply because it causes some business to shift from a predominantly out-of-state industry to a predominantly in-state industry.  Only if the burden on interstate commerce clearly outweighs the State's legitimate purposes does such a regulation violate the Commerce Clause.*" Clover Leaf Creamery Co.*, 449 U.S. at 474 (law banning the sale of milk in plastic containers that benefited in-state pulpwood producers was nonetheless valid "in light of the substantial state interest").  This nondiscriminatory law may indirectly shift some business to in-state breeders, but it cannot be said that this alleged burden clearly outweighs Cook County's legitimate purpose in passing the ordinance.   Where there is a "substantial state interest" that supports the facially neutral law that might indirectly affect interstate commerce, the law will survive a challenge under the Commerce Clause.  *Id.* at 473.  In sum, this neutral law cannot be struck down as unreasonable in light of its substantial benefits.

One additional point merits mention.  The Court rejects defendants' contention that Congress specifically authorized violations of the Commerce Clause in the Animal

---

commerce as the cost to purchase a properly ventilated van and train personnel to obtain the animals can cost tens of thousands."  Second Am. Compl. ¶ 69.  Plaintiffs do not allege that it will be impossible for breeders to transport animals themselves; just that it will be costly.  Moreover, plaintiffs assume that the existing model, in which class B dealers purchase pets from breeders and resell them to pet stores, cannot be changed.  *Id.* ¶¶ 56–58.  Nothing in the ordinance prevents the use of class B dealers to transport the animals from breeders to pet stores, so long as the pet stores buy the pets from breeders that meet the law's requirements.

Welfare Act.  "Congress must manifest its unambiguous intent before a federal statute will be read to permit or to approve [ ] a violation of the Commerce Clause."  *Wyoming*, 502 U.S. at 458.  Although a provision of the AWA allows local governments to regulate in the area of animal control, it does not expressly authorize violations of the Commerce Clause.  *See* 7 U.S.C. § 2143(a)(8).  The Court respectfully disagrees with those courts that have concluded that the AWA authorizes local action that violates the Commerce Clause.  *See Zimmerman v. Wolff*, 622 F. Supp. 2d 240, 245 (E.D. Pa. 2008).

## Conclusion

For the foregoing reasons, the Court dismisses the claims of Petland of Chicago Ridge and James Maciejewski as moot and grants the other defendants' motion to dismiss the second amended complaint [dkt. no. 50].  Plaintiffs have already had two opportunities to amend their complaint, and there is no basis for a third.  The Court directs the clerk to enter judgment in favor of the defendants.

Date:  August 7, 2015